UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | No. 3:08-0604 JUDGE ECHOLS |
| v. | ) ) | |
| CAMPBELL INSURANCE, INC., et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Plaintiff American National Property and Casualty Company ("American National") filed a Motion for Preliminary Injunction (Docket Entry No. 78), on June 1, 2009, to which the Defendants, Tommy L. Campbell, Marsha Colleen Campbell, Campbell Insurance, Inc., and A 2 Z Insurance, Inc. (collectively "Campbell defendants"), filed a response in opposition (Docket Entry No. 89), and American National filed a reply (Docket Entry No. 94-1.)

American National filed a Second Amended Complaint on May 20, 2009 (Docket Entry No. 66), asserting claims against the Campbell defendants for breach of contract, interference with business relations, procurement of breach of contract, violation of the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701, *et seq.*, breach of fiduciary duty, unfair competition, violation of the Tennessee Consumer Protection Act, § 47-18-104(a) & (b)(27), civil conspiracy, concert of action,

1

piercing the corporate veil/alter ego, and injunctive relief.[1] The Motion For Preliminary Injunction rests on American National's claims for breach of contract and violation of TUTSA.

Campbell Insurance filed a counterclaim against American National for wrongful termination. A 2 Z Insurance filed a counterclaim against American National for interference with business relations. (Docket Entry No. 28, Answer and Counterclaim.)

## I. FACTS

In 1997, Tommy and Colleen Campbell started an insurance agency and began selling insurance. In 2000 they incorporated the agency as Campbell Insurance, Inc., with Colleen Campbell serving as President and Tommy Campbell serving as Secretary. The Campbells were the only shareholders. Almost from the beginning, Campbell Insurance (including its unincorporated predecessor) and the Campbells were "captive" agents for American National, meaning they were contractually restricted from placing insurance with other insurance companies, except to the extent specific exceptions were granted by American National. Campbell Insurance was a very successful agency for American National, recently earning approximately $600,000 per year in commissions.

---

[1] American National also named as defendants two other insurance companies, Liberty Mutual Life Insurance Company and Montgomery Mutual Insurance Company, but the allegations and claims against them are not directly at issue in this motion for preliminary injunctive relief.

2

The Campbells' business relationship with American National was rooted in a series of agent agreements. The "American National Property and Casualty Company Corporate Agent Agreement" executed on January 24, 2005 by the Campbells on behalf of Campbell Insurance and Kim Kelley, Agent Administration Specialist, on behalf of American National, governs the instant dispute. (Prelim. Inj. Hr'g Ex. 3.) Section I.D. of the agent agreement is pertinent to the instant motion:

> **EXCLUSIVE OWNERSHIP OF "BUSINESS" AND RIGHTS OF FILES**
> "Business" shall mean all accounts, records, policy files, and client information maintained or in the possession of the Agent. Business includes all accounts, records, files, policies, rates, information regarding names, addresses, and ages of policyholders; the description and location of insured property; and expiration or renewal dates (x-dates) of policies acquired or coming into the Agent's possession during the effective period of this Agreement or any prior Company Agreement. These are **trade secrets** wholly owned by the Company.
>
> All Company "Business" whether furnished by the Company or paid for in whole or part by the Agent, shall be the sole and exclusive property of the Company and shall immediately be returned to the Company or a designated Company representative upon termination of this agreement or upon demand from the Company.

The agreement also precluded Campbell Insurance from competing with American National for one (1) year after termination of the agency agreement. With respect to termination, Section III.C. of the agent agreement provided:

3

**RESTRICTIONS AFTER TERMINATION**
If this Agreement is terminated, whether by you or by the Company, with or without cause, you agree that you will not, for a period of one (1) year after termination, either directly or indirectly, by or through any partner, Agent, employer or firm on your behalf, induce or try to induce any policy holder to lapse, cancel or replace any insurance policy of the Company.

Also, subsections A., B., and D., of Section IV., Policy Rollover, provided:

A. The Agent and the Company agree that the Agent has special open access to customers of the Company during the Agent's work. The Company will assist the Agent with training, office support, publicity of the good name of the Company and in developing customers. The Agent understands that the Company and the other Agents of the Company have a strong and legitimate interest in avoiding "piracy" of those customers even if this Agreement is terminated.

B. Therefore, the Agent covenants and agrees that upon receipt of notice of termination or upon termination of this Agreement (whichever occurs first), whether by the Agent, or by the Company, the Agent will not directly, or indirectly through any partner, Agent, employee, or firm on the Agent's behalf, solicit or accept any property or casualty insurance from any policyholder of the company whose business they wrote, solicited, serviced, or sold while a representative of the Company.

 * * *

D. **ONE YEAR**
   These prohibitions shall last for a period of <u>one year</u> following the termination of this Agreement and shall be effective throughout the Territory identified in Section VI of this Agreement.

Shortly after the Campbells signed the January 24, 2005 agent agreement, Kim Kelley contacted the Campbells and requested that Colleen Campbell withdraw from the agency agreement because only

4

one agent could be a signatory to the contract. Colleen Campbell contends that she reluctantly agreed to withdraw and did so as evidenced by an e-mail from her to Ms. Kelley dated February 16, 2005. On February 11, 2005, at the request of Ms. Kelley, Colleen Campbell entered into a separate solicitor's agreement between Campbell Insurance and herself, as approved by Ms. Kelley. (Prelim. Inj. Hr'g Ex. 11, Tommy Campbell Aff. ¶¶ 4-5.)

As of November 1, 2007, Colleen Campbell resigned her position as a solicitor for Campbell Insurance and transferred her stock to Tommy Campbell. At that time, Tommy Campbell became the sole officer and shareholder of Campbell Insurance. (Id. ¶ 3.)

American National alleges that Colleen Campbell formed A 2 Z Insurance, Inc. on or about November 1, 2007, as an independent insurance agency to have more sales options than were available through American National, with the idea that Tommy Campbell would eventually leave American National and join A 2 Z Insurance. American National claims that Campbell Insurance loaned $6,000 to A 2 Z Insurance to help the company get started, Colleen Campbell worked out of the same offices as Campbell Insurance, she continued to draw $15,000 per month from Campbell Insurance, she answered the phone for Campbell Insurance, and she consummated insurance transactions for Campbell Insurance. The parties dispute the extent to which Colleen Campbell remained involved in the day-to-day operation of Campbell Insurance, whether expenses of the two

5

companies were kept separate, and whether Campbell Insurance paid wages of A 2 Z Insurance employees.

American National contends that A 2 Z Insurance was not in any real sense separate or independent from Campbell Insurance. Rather, A 2 Z was formed as a mere conduit for the Campbells to pirate American National policyholders. American National claims that Campbell Insurance admitted that it helped arrange for, install, and completely paid for (at least through June 30, 2008) the computerized agency management system used by A 2 Z Insurance known as TAM Online, and that Tommy Campbell was involved in arranging for the installation of the TAM Online system in the Campbell Insurance offices. (Prelim. Inj. Hr'g Ex. 17, Campbell Insurance, Inc.'s Responses to Plaintiff's First Set of Requests for Admissions ¶¶ 48-49.) TAM Online was used to store data, including policyholder information, for both Campbell Insurance and A 2 Z Insurance.

In 2008 American National noticed a precipitous drop in production at Campbell Insurance. From October 7, 2007 through June 6, 2008, American National realized that 252 of its policies written or serviced by Campbell Insurance were cancelled, resulting in a loss of $156,730.00 in existing premium payments. (Docket Entry No. 16, Leeper Aff. ¶¶ 11, 21.) Upon investigation, American National learned of the formation of A 2 Z Insurance and the practice of Campbell Insurance to refer American National

6

policyholders to A 2 Z Insurance for their insurance needs. (Id. ¶¶ 14-15.)

American National terminated the agency agreement of Campbell Insurance on June 10, 2008, and demanded return of its "Business" information. (Prelim. Inj. Hr'g Ex. 4.) In a certified letter to Tommy Campbell dated June 13, 2008, American National again demanded, among other things, the return of its "Business" information. (Prelim. Inj. Hr'g Ex. 6.) American National then filed this lawsuit against the Campbell defendants one week later on June 17, 2008. (Prelim. Inj. Hr'g Ex. 7.) As one form of relief, American National requested that the defendants be required to return all information designated as "Business" under the agent agreement. (Id. at 8.)

Campbell Insurance, A 2 Z Insurance, and the Campbells agreed not to compete with American National for one year, as required by the agent agreement. (Prelim. Inj. Hr'g Ex. 8.) The one-year non-compete term expired on June 10, 2009. American National agrees that the defendants are now free to compete, and American National does not ask the Court to extend the non-compete term beyond its expiration date.

Rather, American National seeks a preliminary injunction that restrains Campbell Insurance, A 2 Z Insurance, and Tommy and Colleen Campbell from reviewing or using the "Business" information of American National, as defined in the agent agreement, and

7

requiring them to return to American National all copies of any paper records containing "Business" information of American National and to delete from all computer storage media under their control all such information stored digitally. American National believes that such information remains in the defendants' possession because American National learned during discovery that the defendants stored American National's "Business" information on TAM Online and defendants did not disclose that fact until after American National mirror-imaged the hard drives of the computers located at Campbell Insurance and A 2 Z Insurance. American National claims that, despite its repeated requests that the defendants return American National's "Business" information, as defined in the agent agreement, and Tommy Campbell's previous agreement to do so (Prelim. Inj. Hr'g Ex. 11 ¶ 12), the defendants have refused to do so.

Tommy Campbell denies that he violated his agent agreement with American National (Prelim. Inj. Hr'g Ex. 5), and denies that he has any information or materials that are trade secrets of American National. (Prelim. Inj. Hr'g Ex. 11 ¶¶ 7-8.) He claims that shortly after receiving the termination letter from American National, he contacted Richard Johnson with American National as instructed and Mr. Johnson indicated there was nothing he needed to retrieve from Campbell Insurance. (Id. ¶ 7.) Mr. Campbell attests that the first notice he received that American National wanted

8

anything returned was on August 28, 2008, when his counsel was served with an American National motion requesting injunctive relief. (Id.)

## II. STANDARD OF REVIEW

In determining whether American National has established a right to preliminary injunctive relief, the Court must consider four factors: (1) whether American National has sufficiently established a reasonable likelihood of success on the merits; (2) whether American National may suffer irreparable harm if the injunction is not granted; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction on the public interest. See Tucker v. City of Fairfield, 398 F.3d 457, 461 (6th Cir. 2005).

The test is similar under Missouri law.[2] See Phelps-Roper v. Nixon, 545 F.3d 685, 689 (8th Cir. 2008). A preliminary injunction may issue if the moving party establishes: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury in granting the injunction will inflict on the other party; (3) the probability of the movant succeeding on the merits; and (4) the public interest." Id.

---

[2]Section I H.3. of the agent agreement contained a provision selecting Missouri law to control "the validity, construction, and performance of this Agreement."

9

## III. ANALYSIS

**A. American National's likelihood of success on the merits**

The Court concludes that American National has shown a likelihood of success on the merits of its breach of contract claim. However, the Court also concludes that American National has not carried its burden at this time to show a likelihood of success on the merits of its trade secrets claim under TUTSA. The Court's conclusions are based on the record as it currently stands on the present motion for a preliminary injunction. The Court expresses no opinion on the merits of defendants' pending motion for partial summary judgment (Docket Entry No. 68), or on any other dispositive motion that may be filed by a party.

Generally, Tennessee honors a choice of law provision in a contract provided certain requirements are met. Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999). The choice of law provision must be executed in good faith, the jurisdiction whose law is chosen must bear a material connection to the transaction, the basis for the choice of another jurisdiction's law must be reasonable and not merely a sham or subterfuge, and the parties' choice of another jurisdiction's law must not be contrary to a fundamental policy of a state having a materially greater interest and whose law would otherwise govern. Id.

These requirements are satisfied here. The agent agreement confirms that the corporate headquarters of American National is

10

located in Springfield, Missouri, and the defendants themselves contend that Missouri law applies. (Docket Entry No. 89, Defendants' Response at 2.) The Missouri choice of law clause was apparently agreed to by the parties in good faith, the jurisdiction was chosen because it has a material connection to the business relationship between American National and the Campbell defendants, the choice in the contract to apply Missouri law was reasonable, and the choice of Missouri law is not contrary to the policy of Tennessee, which may have a materially greater interest in the transaction. In any event, the law of Missouri and Tennessee is very similar on the breach of contract claim.

Under Missouri law, the elements of a breach of contract claim are: (1) a contract between the plaintiff and the defendant; (2) rights of the plaintiff and obligations of the defendant under the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff. Teets v. American Family Mut. Ins. Co., 272 S.W.3d 455, 461 (Mo. Ct. App. 2008). "The cardinal rule of contract interpretation is 'to ascertain the intention of the parties and to give effect to that intention." Id. The whole document should be considered, and the plain, ordinary and usual meaning of the contract's words should be used in interpreting the agreement. Id. A contract is ambiguous only if disputed language, in context with the entire agreement, "is reasonably susceptible of more than one construction giving the

11

words their plain and ordinary meaning as understood by a reasonable average person." Id. Extrinsic evidence cannot be used to create an ambiguity. Id. Where a contract is clear and unambiguous on its face, it is not open to judicial construction, and this Court cannot go outside the unambiguous agreement to make a new contract for the parties. Bydalek v. Brines, 947 S.W.2d 135, 142 (Mo. Ct. App. 1997).[3]

There is no dispute that, at the time the 2005 agent agreement was executed, Tommy and Colleen Campbell and Campbell Insurance entered into the agreement to serve as "captive" agents for American National. For purposes of this motion for preliminary injunction, American National has shown that it had specific rights, and the Campbell defendants had specific obligations under the agent agreement. American National provided its corporate

---

[3]Similarly, under Tennessee law, the elements of breach of contract are: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of contract. See BancorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006). "Contract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains." Ellis v. Pauline S. Sprouse Residuary Trust, 280 S.W.3d 806, 814 (Tenn. 2009). This Court is not at liberty to make a new contract for the parties who have spoken for themselves. Id. The "courts do not concern themselves with the wisdom or folly of a contract, . . . and will not relieve a party of its contractual obligations simply because the contract later proves to be burdensome or unwise." Id. When the parties have reduced their agreement to writing, the law favors enforcing the contract as written, and in the absence of fraud, mistake, or other supervening legal reason, the court should construe an unambiguous written contract as the court finds it. Id.

12

name, financial strength, insurance products, training, and other assistance to help Tommy and Colleen Campbell become successful agents selling only American National insurance. In return for developing business and writing American National policies for customers, American National agreed to pay the Campbell defendants commissions, bonuses, and other forms of compensation, such as trips to international destinations.

American National has further shown that the Campbells were exclusively agents of American National, and they could solicit and submit applications for insurance only to American National. Under their agent agreement, the parties clearly and unambiguously agreed that certain "Business" information obtained about American National's policyholders during the course of their agent agreement was the sole and exclusive property or "trade secrets" of American National, including all policies written; the names, addresses, and ages of the policyholders; the description and location of insured properties; rate information, the expiration dates of policies acquired or coming into the agent's possession; and accounts, records, and files. The contract could not be clearer that exclusive ownership of the "Business" developed by the Campbell defendants as captive agents belonged only to American National and not to the Campbell defendants. Cf. Massari v. Foster, 569 A.2d 399, (Pa. Commonw.Ct. 1990) (holding American National's agent agreement with terminated agent stated that American National owned

13

"the business" which consisted at least in part of property and casualty insurance policies).

As such, the Campbell defendants had an obligation under the agent agreement to return to American National any and all "Business" information belonging to American National which was in their possession at the time the agent agreement was terminated on June 10, 2008. The Court finds that American National did not delay in requesting the return of such "Business" because it included such a demand in the June 10 and June 13 letters addressed to Tommy Campbell and in the original Complaint filed in this action one week after the agent agreement was terminated. To the extent the Campbell defendants have retained any such "Business" in their possession to the present date, it must be returned to American National in accordance with the terms of the agent agreement.

The Court will grant American National a preliminary injunction requiring the Campbell defendants to return such "Business" information to American National immediately. The Court will also require the Campbell defendants to file a statement with the Court within ten (10) days after entry of the preliminary injunction Order confirming that the Campbell defendants have complied with the terms of the preliminary injunction.

As to American National's trade secrets claim, the Tennessee statute defines "trade secret" as:

14

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process or plan that:
>
> > (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). The parties dispute whether American National has shown that the "Business" it seeks to retrieve from the Campbell defendants qualifies as "trade secrets" under this statute. A number of issues are raised concerning whether policyholder and other "Business" information of American National meets the definition of a "trade secret" as set out in subsection (A) of the statute. The Court finds that it need not resolve those disputes at this time because American National has not met its burden under subsection (B) of the statute to show that the "Business" at issue is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

To satisfy this prong of the statute, American National submitted with its reply brief the Declaration of Stuart M. Paulson. (Docket Entry No. 95.) Mr. Paulson attests that he is Vice President and Deputy General Counsel for American National and he is "familiar with the controls American National maintains on access to its Business information . . . which American National

deems highly confidential and from which American National derives substantial economic value." (Id. ¶¶ 1-2.) Mr. Paulson further attests:

> 3. As evidenced by the language of American National's agent agreements and American National's pursuit of litigation, such as this lawsuit, to enforce those agent agreements, American National maintains and enforces absolute prohibitions on the distribution or use of any American National Business information and/or the retention of American National Business information after the termination of any agent's relationship with American National.
>
> 4. It would not be possible, using lawful means, for a person outside of American National to assemble from publicly available information or other sources external to American National either American National's company-wide policyholder list or . . . a list of policyholders serviced by any individual American National agent.

(Id. ¶¶ 3-4.)

Thus, Mr. Paulson avers in paragraph 3 only that the language of the agent agreement and American National's enforcement of the agent agreement through litigation constitute the efforts American National undertakes to ensure secrecy of "Business" information. This testimony, however, is purely conclusory and does not provide the Court with any facts from which the Court can determine the internal processes American National uses to ensure that its "captive" agents are informed and trained to treat American National "Business" as trade secrets. The Court believes such factual testimony is necessary, especially when the Campbell defendants argue that Mr. Patrick Leeper, an Assistant Vice President for American National, conceded in American Nat'l

16

Property & Cas. Co. v. Brass, 739 N.W.2d 491, (Wis. Ct. App. 2007), that American National did not consider its policyholders' names to be trade secrets, that the monthly agent's commission statements containing information about the policyholders were the agent's property, not American National's, and that information regarding policyholders' locations, coverages and other characteristics could be obtained from other sources, including the policyholders themselves.

In Xerox v. O'Dowd, No. 3:06-0434, 2006 WL 3053408 at *2 (M.D. Tenn. Oct. 26, 2006), a case cited by American National, Xerox Corporation presented extensive evidence at the preliminary injunction hearing about the confidential and proprietary nature of its business information and the extensive steps taken by the corporation to be certain that its dealers protected the confidentiality of the information and returned it to Xerox upon leaving the company. American National, on the other hand, did not present any similar convincing evidence at the preliminary injunction hearing.

Therefore, the Court concludes that American National has not shown at this time a likelihood of success on the merits of its trade secrets claim under TUTSA because it did not show that its "Business" information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

17

## B. American National's showing of irreparable harm

The Court concludes that American National has made a sufficiently adequate showing of irreparable harm on its breach of contract claim to warrant a preliminary injunction. Not only does the evidence show that the Campbell defendants appear to be in possession of American National's "Business" information without authorization and in violation of the agent agreement, but also that the Campbell defendants have already used that "Business" information in their efforts to sell competing insurance policies to American National policyholders. As a result of such competing sales activity, American National will lose business opportunities and goodwill that cannot be measured in monetary damages alone. See Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992); Naegele v. Biomedical Sys. Corp., 272 S.W.3d 385, 390 (Mo. Ct. App. 2008) (injunctive relief proper where irreparable harm is likely to result and there is no adequate remedy at law). The Court concludes that American National has made a showing of irreparable harm.

## C. The balance of hardships

The balance of hardships tilts clearly in favor of American National. The hardship that issuance of a preliminary injunction will impose on the Campbell defendants is the necessity to compete for policyholders for other insurance companies without the use of American National's "Business" information, which the Campbell

18

defendants agreed to return to American National upon termination of the agent agreement. Failure to issue a preliminary injunction will permit the Campbell defendants to utilize any American National "Business" information in their possession in an unauthorized manner to the disadvantage of American National in violation of the agent agreement. "It is appropriate for the courts to enforce contracts which reasonably protect legitimate business interests." Furniture Mfg. Corp. v. Joseph, 900 S.W.2d 642, 647 (Mo. Ct. App. 1995). "One such protectible interest is that of customer contacts." Id. It is not necessary for American National to show actual damage has occurred before an injunction may be obtained, see id., although American National has produced evidence of actual loss of policyholders that has already occurred. The Court concludes that this factor weighs in favor of American National.

**D. The impact of an injunction on the public interest**

This factor is satisfied because the public has a strong interest in enforcing valid contracts and discouraging unfair trade practices and unfair competition. See Hoover Transp. Servs. v. Frye, 77 Fed. Appx. 776, 785 (6th Cir. 2003).

### IV. CONCLUSION

For all of the reasons stated, the Court concludes that American National's Motion for a Preliminary Injunction should be GRANTED. The Court will require American National to post a surety

19

bond in the amount of $100,000.00 as security for the preliminary injunction under Federal Rule of Civil Procedure 65.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

20

Case 3:08-cv-00604   Document 99   Filed 06/19/09   Page 20 of 20 PageID #: 2110