**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:08-cv-00604 |
| | ) | Judge Trauger |
| CAMPBELL INSURANCE, INC., *et al.*, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM**

Pending before the court are the Motion for Summary Judgment on Counterclaim filed by

plaintiff American National Property and Casualty Company (Docket No. 269), to which

defendant Tommy L. Campbell has filed a response (Docket No. 278), and in support of which

the plaintiff has filed a reply (Docket No. 290), and the Motion to Amend filed by defendants

Tommy Campbell, Marsha Colleen Campbell, Campbell Insurance, Inc., and A 2 Z Insurance,

Inc. (Docket No. 301), to which the plaintiff has filed a response (Docket No. 306). For the

reasons discussed below, the plaintiff's motion will be granted and the defendants' motion will

be denied.

**FACTS**

The plaintiff, American National Property and Casualty Company ("American

National"), is an insurance company that formerly contracted with defendants Tommy Campbell

("Campbell"), Marsha Colleen Campbell ("Colleen Campbell") (collectively, the "Campbells"),

1

and Campbell Insurance, Inc. ("Campbell Insurance") to act as insurance agents.[1]  This case

arises from those defendants' alleged breach of contract and tortious conduct.

In 1997, Tommy Campbell and his wife, Colleen, who live in Franklin, Tennessee,

became insurance agents for American National.[2]  Throughout the duration of their relationship

with American National, they were exclusive, or "captive," agents, meaning that they were

contractually restricted from placing insurance with other insurance companies.

The Campbells each signed separate agent agreements with American National, dated

June 16, 1997.  Tommy Campbell's agreement (the "1997 Agreement") provided, in a section

titled "Limitation on Authority":

> 1.  You have only the power or authority which this Agreement
> specifically grants to you.  You will not assume that any power or
> authority is implied.  In general, you are denied all power and
> authority not specifically granted, including, but not limited to, the
> following:
>
> a) Be licensed or appointed as an Agent or broker or agency owner
> with any other property and casualty insurance company without
> the Company's written consent.
>
> b) Either directly or indirectly write or service by or through any
> solicitor, partner, Agent, firms, or broker insurance for any other
> property and casualty company . . . .
>
> . . .

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of facts, responses thereto, and related exhibits (Docket Nos. 270, 279, 281, 291).  The court draws all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

[2] The term "agent" is used colloquially.  The agent agreements provided that the Campbells were independent contractors.

> k) Participate in joint office arrangements with Agents or representatives of other insurance companies. This would include sharing office space or agency expenses with Agents, brokers, or representatives of other insurance companies.

(Docket No. 279, Ex. 1 at 3-4.)

The 1997 Agreement further provided for certain compensation after termination of the agreement:

> Payments will be made monthly to qualified Agents as specified in the Post-Termination Compensation Schedule. If you have violated any of the provisions of this Agreement or acted to prejudice materially the interests of the Company at, before, or after termination of this Agreement, you shall forfeit all commissions and all other compensation due or to accrue under this or any previous Agreement between you and the Company.

(*Id.* at 6.) It also contained a one-year non-compete clause, in the event the agreement was terminated.

The Campbells prospered as agents, and, in 2000, they incorporated their agency as Campbell Insurance, Inc., with Tommy serving as president, Colleen serving as secretary, and both owning stock. On January 24, 2005, American National and the Campbells signed a corporate agent agreement designating Campbell Insurance as an exclusive agent (the "2005 Agreement"). The agreement was signed by Tommy and Colleen Campbell as the stockholders of Campbell Insurance, and it provided that the terms "you" or "your," as used throughout the agreement, "shall mean [Campbell Insurance's] Stockholder(s) whether one or more individuals." (*Id.*, Ex. 6 at 1.)

The 2005 Agreement contained much of the same language as the 1997 Agreement; for

example, it contained identical language regarding limitations on authority and the non-compete

clause. (*Id.* at 4-5, 7.) The 2005 Agreement also contained a merger clause:

> This Agreement . . . constitutes the sole agreement and supersedes
> any and all prior Agreements between you and the Company. This
> Agreement shall not impair your right to monies, if any, earned
> under a prior Agreement or Agreements with the Company.

(*Id.*, Ex. 6 at 8.) Notably, the 2005 Agreement did not contain a provision regarding post-

termination compensation.

The Campbells contend that, after they signed the 2005 Agreement, American National

contacted them to terminate Colleen Campbell's individual agent agreement, explaining that

there could be only one agent under the corporate agreement. Although Colleen Campbell

terminated her agreement in February 2005,[3] no similar termination of Tommy Campbell's

individual agreement occurred.

By 2007, the Campbells believed that they could make more money as independent, non-

exclusive insurance agents. On November 1, 2007, Colleen Campbell resigned from Campbell

Insurance and transferred her shares of the corporation to Tommy Campbell. This left Tommy

Campbell as the president and sole shareholder of Campbell Insurance. Colleen Campbell then

formed A 2 Z Insurance, Inc. ("A 2 Z"), a separate insurance agency. Tommy Campbell signed

a $100 check to cover A 2 Z's incorporation fees, and he gave A 2 Z an interest-free loan of

$6,000, which A 2 Z has not yet repaid.

Many facts regarding A 2 Z's development and operation are undisputed. A 2 Z needed

---

[3] Colleen Campbell had signed a second agent agreement in 2001; this was the agreement
being terminated.

to create relationships with American National's competitors, and, in the months following November 2007, Tommy Campbell assisted Colleen Campbell in her efforts to contract with insurance companies. (Docket No. 269, Ex. 4 at 398, 539.) Tommy Campbell filled out at least some of A 2 Z's appointment applications (*id.*, Ex. 2 at 553), and he attended several meetings between A 2 Z and various insurance companies. For example, in a meeting with Montgomery Insurance, he stated that A 2 Z planned to sell Montgomery policies to at least some existing American National policyholders. Ultimately, A 2 Z did secure relationships with some of the plaintiff's competitors.

It is undisputed that, in late 2007 and early 2008, all of A 2 Z's business was conducted by Campbell Insurance employees, with Campbell Insurance paying their wages. At joint staff meetings, both Tommy and Colleen Campbell told employees that, if existing American National policyholders requested quotes from other insurers, the employees should offer them quotes.[4] (Docket No. 269, Ex. 4 at 469-70.) Tommy Campbell also told the employees that "he did not want anyone to let American National know that its policyholders were being moved to other insurance companies." (Docket No. 279 ¶ 103.)

It is further undisputed that A 2 Z operated out of the same office suite as Campbell Insurance. Campbell Insurance paid A 2 Z's rent, and A 2 Z was allowed to access Campbell Insurance's telephone and computer systems. Campbell Insurance also purchased a new online

---

[4] It is undisputed, for example, that Tommy Campbell told one Campbell Insurance employee that he had obtained appointments with insurance companies other than American National. The employee then began writing policies with those companies for a number of American National policyholders.

agency management system, called TAM Online, for A 2 Z's exclusive benefit, and Tommy

Campbell personally arranged for the system's purchase and installation. Even though TAM

Online was not intended for use by Campbell Insurance, Campbell transferred contact and policy

information for Campbell Insurance's American National policyholders to the system.

Moreover, Campbell allowed Colleen Campbell and other A 2 Z employees to access American

National's proprietary customer online database. A 2 Z employees used information from this

database when selling competitors' policies to existing American National customers.

The parties dispute the extent to which Tommy Campbell actively persuaded American

National policyholders to switch to other insurance companies. Regardless, the number of

American National policies written through Campbell Insurance dropped precipitously.

Between October 2007 and June 2008, 252 American National policyholders canceled or

switched their policies, a rate that exceeded the statistical norm. After some investigation,

American National discovered the existence of A 2 Z, and, on June 10, 2008, American National

terminated its agent agreement with Campbell Insurance. Soon after, Tommy Campbell and the

remaining Campbell Insurance employees became employees of A 2 Z. Campbell Insurance has

since been effectively dissolved.

American National filed this suit in June 2008. Its Third Amended Complaint contains

claims for, among other things, breach of contract and tortious interference with business

relations. (Docket No. 160.) The Campbells and Campbell Insurance have responded to the

plaintiff's various amended complaints with a string of counterclaims. Currently, Tommy

Campbell is asserting a counterclaim for breach of contract against American National for its

6

failure to pay him post-termination compensation, which he alleges is due under the 1997

Agreement.  (Docket No. 176 at 16-17.)

**ANALYSIS**

The plaintiff has filed a Motion for Summary Judgment, pursuant to Federal Rule of Civil

Procedure 56, regarding Tommy Campbell's counterclaim.  In response, Tommy Campbell has

filed a Motion to Amend his counterclaim, pursuant to Rule 15.[5]

**I.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary

judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  If a moving defendant shows that there is no

genuine issue of material fact as to at least one essential element of the plaintiff's claim, the

burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific

facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351,

374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In

evaluating the evidence, the court must draw all inferences in the light most favorable to the

[plaintiff]."  *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the

---

[5] Technically, the Motion to Amend was jointly filed by Tommy Campbell, Colleen Campbell, Campbell Insurance, and A 2 Z, because those defendants filed a joint Answer to the Third Amended Complaint.  The proposed amendments only pertain to Tommy Campbell's counterclaim, however.

7

matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.    Tommy Campbell's Counterclaim

The plaintiff argues that it does not owe Tommy Campbell any post-termination compensation because the 1997 Agreement was superseded by the 2005 Agreement or, alternatively, because Campbell breached the terms of both agreements. (Docket No. 272 at 6, 7-23.) In response, Campbell argues that material issues of fact exist regarding whether he breached any agreement with American National. (Docket No. 278 at 5-6, 8-10.)

As an initial matter, both the 1997 Agreement and the 2005 Agreement provide that they shall be construed under Missouri law. (Docket No. 279, Ex. 1 at 4; *id.*, Ex. 6 at 5.) Under Missouri law, "[t]he cardinal rule of contract interpretation is to ascertain the intention of the parties and to give effect to that intention." *Teets v. American Family Mut. Ins. Co.*, 272 S.W.3d 455, 461 (Mo. Ct. App. 2008) (quotation marks omitted). When a contract is clear and unambiguous on its face, it is not open to judicial construction, and the court cannot go outside the unambiguous agreement to make a new contract for the parties. *Bydalek v. Brines*, 947 S.W.2d 135, 142 (Mo. Ct. App. 1997). A contract is ambiguous only if the disputed language "is reasonably susceptible of more than one construction giving the words their plain and ordinary

8

meaning as understood by a reasonable average person." *Teets*, 272 S.W.3d at 461. When interpreting the agreement, the court should consider the whole document and should use the plain, ordinary, and usual meaning of the contract's words. *Id.*

The plaintiff is correct that the 2005 Agreement superseded Tommy Campbell's 1997 Agreement. Campbell signed the 2005 Agreement as a stockholder of Campbell Insurance, and he admits that he was a party to the agreement. (*See* Docket No. 278 at 4.) The 2005 Agreement provided that all clauses using the words "you" or "your" applied to Campbell Insurance stockholders; thus, such clauses applied to Tommy Campbell in an individual capacity. (Docket No. 279, Ex. 6 at 1.) The agreement's merger clause provided that "[t]his Agreement . . . constitutes the sole agreement and supersedes any and all prior Agreements between you and the Company." (*Id.* at 8.) The result of this clear and unambiguous language is that the 2005 Agreement superseded Tommy Campbell's 1997 Agreement.[6]

This does not end the inquiry, however. The merger clause provided that the 2005 Agreement "shall not impair your right to monies, if any, earned under a prior Agreement or Agreements with the Company." (*Id.*) This means that the court must look to all the relevant provisions of the 1997 Agreement to ascertain Campbell's "right to monies" that he "earned" under that agreement.

The 1997 Agreement provided for certain post-termination payments. But the post-termination compensation clause stated that, "[i]f you have violated any of the provisions of this

---

[6] In light of this plain language, it is immaterial that American National expressly terminated Colleen Campbell's individual agent agreement but did not expressly terminate Tommy Campbell's 1997 Agreement.

Agreement or acted to prejudice materially the interests of the Company at, before, or after

termination of this Agreement, you shall forfeit all commissions and all other compensation due

or to accrue under this . . . Agreement." (*Id.*, Ex. 1 at 6.)  The parties dispute whether Campbell

had "earned" his post-termination compensation under the 1997 Agreement by the time the 2005

Agreement was signed.  The court does not need to resolve this issue, however, because the right

to compensation was explicitly contingent on Campbell not breaching any terms of the 1997

Agreement.[7]

The undisputed facts show that Campbell did breach the terms of the 1997 Agreement

and did act to prejudice American National's interests.  Specifically, Campbell admits that he

shared office space, computers, and telephones with A 2 Z, an agency that was formed

specifically so it could offer insurance policies from American National's competitors.  (Docket

No. 279 ¶¶ 40, 45, 61-71.)  This breaches the clause, found in both the 1997 and 2005

Agreements, preventing Campbell from "[p]articipat[ing] in joint office arrangements with

Agents or representatives of other insurance companies."  (*Id.*, Ex. 1 at 4.)

Furthermore, Campbell admits that he allowed A 2 Z employees to access American

National's proprietary database of policyholder information, which the A 2 Z employees then

---

[7] Campbell makes much of the fact that the plaintiff concedes that "Mr. Campbell would have been eligible for post-termination compensation under the 2005 Agent Agreement had he not forfeited the right to such compensation by his actions in pirating American National policyholders, and assisting other of the Campbell Defendants in pirating American National policyholders, in violation of the 2005 Agent Agreement." (Docket No. 272 at 2; Docket No. 278 at 4-5.)  But this statement simply concedes that the 2005 Agreement effectively incorporated the post-termination compensation clause from the 1997 Agreement.  It does not change the fact that Campbell could forfeit the compensation by breaching the terms of the 1997 Agreement.

used when selling competing policies (Docket No. 279 ¶¶ 76-77); he admits that he provided

startup funds to A 2 Z and paid that agency's employees (*id.* ¶¶ 58-60); and he admits that he

assisted A 2 Z in securing relationships with American National's competitors (*id.* ¶ 107). All of

these actions prejudiced American National's interest in retaining its current customers. In each

case, Campbell provided material support to an agency that sold competing insurance policies to

American National policyholders.

Because the undisputed facts show that Tommy Campbell breached the terms of the 1997

Agreement, he is not due any post-termination compensation.[8] Accordingly, the court will grant

the plaintiff's Motion for Summary Judgment and will dismiss Tommy Campbell's

counterclaim.

## III.    Motion to Amend

Campbell has filed a Motion to Amend, seeking to amend his counterclaim to allege that

the 2005 Agreement, in addition to the 1997 Agreement, is the basis for the post-termination

compensation that he is due. But, as discussed above, if Campbell is owed any post-termination

compensation, it ultimately arises from the terms of the 1997 Agreement, and Campbell's breach

of that agreement means that he forfeited his rights to any compensation. Thus, the proposed

changes to the counterclaim are futile, and the defendant's motion will be denied.[9] *See Colvin v.*

*Caruso*, 605 F.3d 282, 294 (6th Cir. 2010) ("A motion to amend . . . should be denied if the

---

[8] The plaintiff argues that Campbell breached the 1997 Agreement in various additional ways, but the court does not need to reach those issues.

[9] Because of this obvious futility, the court will also deny the defendant's Motion for Leave to file a reply in support of his Motion to Amend (Docket No. 307).

amendment . . . would be futile." (quotation marks omitted)).

## **CONCLUSION**

For all of the reasons discussed above, the court will grant the plaintiff's Motion for

Summary Judgment and will deny Tommy Campbell's Motion to Amend.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge