IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:08-cv-00604 |
| | ) | Judge Trauger |
| CAMPBELL INSURANCE, INC., *et al.*, | ) ) | |
| Defendants. | ) | |

# MEMORANDUM

Two motions filed by defendants Campbell Insurance, Inc., Tommy L. Campbell, A 2 Z Insurance, Inc., and Marsha Colleen Campbell are currently pending before the court: (1) a Motion for Partial Summary Judgment (Docket No. 280), to which plaintiff American National Property and Casualty Co. has filed a response and a sur-reply (Docket Nos. 313, 332), and in support of which the defendants have filed a reply and a sur-sur-reply (Docket Nos. 325, 339); and (2) a Motion to Amend (Docket No. 327), to which the plaintiff has filed a response (Docket No. 340), and in support of which the defendants have filed a reply (Docket No. 344). For the reasons discussed below, the Motion for Partial Summary Judgment will be denied, and the Motion to Amend will be granted.

# FACTS

The plaintiff, American National Property and Casualty Company ("American National"), is an insurance company that formerly contracted with defendants Tommy Campbell ("Campbell"), Marsha Colleen Campbell ("Colleen Campbell") (collectively, the "Campbells"),

1

and Campbell Insurance, Inc. ("Campbell Insurance") to act as insurance agents.[1]  This case arises from those defendants' alleged breach of contract and tortious conduct.

In 1997, defendant Tommy Campbell signed an insurance agent agreement with American National (the "1997 Agreement").  On the same day, his wife, Colleen Campbell, signed a substantively identical agreement.  Throughout the duration of their relationship with American National, the Campbells were exclusive, or "captive," agents, meaning that they were contractually restricted from placing insurance with other insurance companies.  They prospered, and, in 2000, they incorporated their agency as Campbell Insurance, Inc.  In 2005, American National and the Campbells signed a corporate agent agreement designating Campbell Insurance as an exclusive agent (the "2005 Agreement").  This agreement superseded the 1997 Agreement, which Campbell had signed in his individual capacity.  (Docket No. 308 at 9.)

By 2007, the Campbells believed that they could make more money as independent, non-exclusive insurance agents.  On November 1, 2007, Colleen Campbell resigned from Campbell Insurance and transferred her shares of the corporation to Tommy Campbell.  This left him as the president and sole shareholder of Campbell Insurance.  Colleen Campbell then formed defendant A 2 Z Insurance, Inc. ("A 2 Z"), a separate insurance agency.[2]

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of facts, responses thereto, and related exhibits (Docket Nos. 281, 314).  The court also draws upon the statement of facts in the court's previous Memorandum regarding the plaintiff's Motion for Summary Judgment.  (Docket No. 308 at 1-7.)  The court draws all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

[2] The court will refer to the Campbells, Campbell Insurance, and A 2 Z, collectively, as the "Campbell defendants."

In the months following November 2007, Tommy Campbell assisted Colleen Campbell in her efforts to contract with insurance companies. Ultimately, A 2 Z secured relationships with some of the plaintiff's competitors. In late 2007 and early 2008, all of A 2 Z's business was conducted by Campbell Insurance employees, with Campbell Insurance paying their wages. The lines between the companies were blurred; for example, Campbell Insurance purchased a new online agency management system, called TAM Online, for A 2 Z's exclusive benefit. In addition, Campbell allowed Colleen Campbell and other A 2 Z employees to access American National's proprietary customer online database.

The parties dispute the extent to which Tommy Campbell actively persuaded American National policyholders to switch to insurance written through A 2 Z. Regardless, the number of American National policies written through Campbell Insurance dropped precipitously. Between October 2007 and June 2008, 252 American National policyholders cancelled or switched their policies, a rate that exceeded the statistical norm. After some investigation, American National discovered the existence of A 2 Z, and, on June 10, 2008, American National terminated its agent agreement with Campbell Insurance. Soon after, Tommy Campbell and the remaining Campbell Insurance employees became employees of A 2 Z. Campbell Insurance has since been effectively dissolved.

American National filed this suit in June 2008. Its Third Amended Complaint contains claims for, among other things, breach of contract and tortious interference with business relations. (Docket No. 160.) The plaintiff has retained a Certified Public Accountant, Tracy Coenen, to calculate the company's lost profits attributable to the cancelled policies. (*See*

Docket No. 281, Ex. 1 at 30-31 (Coenen's written report).)

The Campbell defendants have now filed a Motion for Partial Summary Judgment, pursuant to Federal Rule of Civil Procedure 56, regarding the plaintiff's claimed damages. The defendants argue that there is no causal connection between their breach of contract and certain policyholders' decision to switch from American National to A 2 Z. (Docket No. 284 at 3-5.) Thus, the defendants argue, lost profits attributable to those policyholders should not be included in the plaintiff's damages.

In support of their motion, the defendants have submitted sworn testimony, from *ex parte* depositions taken without the participation of the plaintiff's counsel, of 55 policyholders who switched from American National to A 2 Z. (Docket No. 281, Exs. 3-4.) The main thrust of the testimony is that, regardless of the defendants' actions, the policyholders disliked American National's high premiums and planned to cancel their policies. For example, the defendants' brief highlights the testimony of former American National policyholder Vickie M. Alexander:

> Q. Sometime last year, did you make the decision to leave [American National]?
>
> A. Yes, I did.
>
> Q. Tell me why.
>
> A. Due to premiums. It wouldn't have mattered if it was one of their companies or another company, I was going somewhere with less premiums – with cheaper premiums.
>
> Q. All right. And did you contact Tommy or Colleen or somebody here at A 2 Z?
>
> A. Yes, I did. I contacted them.

> Q. Had you made a decision you were going someplace else before you ever contacted them?
>
> A. Yes. Yes.
>
> Q. If Tommy and Colleen had not been able to help you, would you have gone to another agency and gotten it?
>
> A. Oh, yeah. Yeah, definitely.
>
> Q. So would it be fair to say you left American National because of the premiums they were charging you?
>
> A. Yes, sir.

(*Id.*, Ex. 3 at 6-7.) Alexander also verified that she signed a document titled "No Solicitation Understanding" and that the statements therein were "true."[3] (*Id.* at 7.) The testimony from the other 54 policyholders is, broadly speaking, similar to Alexander's testimony.

The Campbell defendants have also filed a Motion to Amend their collective Answer to the Third Amended Complaint, seeking to: (1) amend their affirmative defense of "offsetting benefits" to clarify that they are entitled to an offset against the plaintiff's damages in the amount of the post-termination compensation that Tommy Campbell forfeited; (2) add an affirmative defense regarding punitive damages and a request for a bifurcated hearing regarding punitive damages; and (3) amend their responses to certain factual allegations to conform to facts learned

---

[3] Many of the policyholders who switched to A 2 Z signed a "No Solicitation Understanding," a short statement indicating that he or she "has not been induced, either directly or indirectly, by Tommy Lynn Campbell or through any partner, agent, employer or firm on behalf of Tommy Lynn Campbell, to lapse, cancel or replace any insurance policy of American National . . . ." (*E.g.*, Docket No. 281, Ex. 3 at 9.) The document further stated that the policyholder was signing "of [his or her] own free will and not under any duress whatsoever." (*Id.*)

in discovery.

## ANALYSIS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### II. Causation and Damages

The Campbell defendants have submitted the testimony of 55 former American National

6

policyholders who are currently insured through A 2 Z. The defendants argue that, because the policyholders were planning to leave American National regardless of the Campbells' actions, the Campbells' alleged breach of contract "did not cause a loss to [American National] with regard to these fifty-five policyholders." (Docket No. 284 at 4.) The defendants "seek an order that the annual premiums related to each of the policies held by these 55 policyholders not be included in the calculation of damages." (Docket No. 325 at 3.)

In response, the plaintiff argues that the statements submitted by the defendants are not sufficient to support summary judgment on the issues of causation and damages. (Docket No. 313 at 12-17.) The court agrees.[4]

---

[4] The plaintiff also raises several alternative arguments. Specifically, it argues that Rule 56 does not allow a party to file a partial motion for summary judgment on the issue of damages. (Docket No. 313 at 1-5.) The plaintiff cites, among other cases, *Hawkinson v. Montoya*, No. 04-cv-01271, 2007 U.S. Dist. LEXIS 20426 (D. Colo. Mar. 12, 2007). *Hawkinson* parsed the then-current language of Rule 56 and held that a motion that "seeks to resolve only specified issues relevant to [a party's] claims," as opposed to a motion that seeks to resolve the entire claim, is "entirely inappropriate under any provision of Rule 56." *Id.* at *4.

But, on December 1, 2010, amendments to Rule 56 took effect. Amended Rule 56(a), which is captioned "Motion for Summary Judgment or Partial Summary Judgment," now provides that "[a] party may move for summary judgment, identifying each claim or defense – *or the part of each claim or defense* – on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). The Advisory Committee notes to that section state:

> The first sentence [of Rule 56(a)] is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense. The subdivision caption adopts the common phrase 'partial summary judgment' to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion.

Fed. R. Civ. P. 56(a) advisory committee's note.

Thus, the defendants' Motion for Partial Summary Judgment is procedurally proper. It

7

The parties do not dispute that the substantive law of Missouri applies to the plaintiff's contract claims.[5] Causation is a necessary element of a breach-of-contract claim under Missouri law; among other things, a plaintiff must show "damages resulting from the breach." *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817 (Mo. Ct. App. 2008) (quotation marks omitted). A plaintiff may recover three kinds of damages: actual, consequential, and benefit-of-

---

must be noted, however, that, had this case been originally assigned to Judge Trauger, the initial case management order would have required the filing of a motion to grant leave for the filing of a partial summary judgment motion that justified such a motion in terms of time and resources to be expended by the court and the parties.

The plaintiff further argues that the court cannot consider the sworn statements submitted by the defendants because they are not proper depositions. (Docket No. 313 at 9-11.) It is true that the plaintiff's counsel had no opportunity to cross-examine the witnesses. But courts often allow such evidence, as long as it meets Rule 56's requirements for affidavits – namely, that the statements "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the [witness] is competent to testify on the matters stated," Fed. R. Civ. P. 56(c)(4). *See, e.g.*, *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323-24 (9th Cir. 1991) (allowing the defendant to rely on the transcript of an *ex parte* witness interview because "the questions were given under oath" and, "[n]otwithstanding the fact that the statement was unsigned, it was at least as reliable as an affidavit"); *Jones v. City of Franklin*, No. 3:08-cv-1134, 2010 U.S. Dist. LEXIS 60344, at *10-11 (M.D. Tenn. June 18, 2010) (allowing the submission of depositions from a different case, and stating that "[t]he use of a deposition in summary judgment proceedings need only satisfy the admissibility requirements for affidavits, namely, that they are: (1) taken under oath; and (2) based on personal knowledge"). Here, the witness statements satisfy those requirements.

In any event, these issues are moot, because the court is denying the defendants' Motion for Partial Summary Judgment on other grounds. Similarly, the court need not reach the plaintiff's argument that, because the 2005 Agreement contains a liquidated damages provision, there is no need to determine whether the policyholders would have eventually cancelled their American National policies. (*See* Docket No. 332 at 2-6.)

[5] The parties' briefs focus exclusively on the plaintiff's breach of contract claim, ignoring the plaintiff's other causes of action, which include tortious interference with business relations, breach of fiduciary duty, and unfair competition. (*See* Docket No. 160.)

8

the-bargain.[6]  *Id.* at 818.  In *Catroppa*, the court explained:

> Actual damages are compensatory and are measured by the loss or
> injury sustained as a direct result of the wrongful act.
> Consequential damages are those damages naturally and
> proximately caused by the commission of the breach and those
> damages that reasonably could have been contemplated by the
> defendant at the time of the parties' agreement.  Finally,
> benefit-of-the-bargain damages, also called lost profits damages,
> are the net profits a plaintiff would have realized had the contract
> not been breached.

*Id.* (citations and quotation marks omitted).  Thus, in each case, the plaintiff must show a causal relationship between the defendants' breach and the damages suffered.

Here, causation and damages clearly exist.  The plaintiff alleges that the Campbell defendants breached their contract with American National by selling competing insurance to American National policyholders.  The plaintiff lost the business of the 55 policyholders at issue when they cancelled their American National policies in favor of policies with A 2 Z.  Before that point, the policyholders paid premiums to American National; afterward, they did not.  This is a loss, and it was certainly a "direct result" of the Campbells' decision to sell alternative insurance to the policyholders.

The defendants argue that the losses related to the 55 policyholders are zero because the policyholders already planned to cancel their policies.  But it seems obvious that, without the Campbells' actions, at least some of the policyholders would have retained their American National policies for longer than they actually did.  The testimony submitted by the defendants

---

[6] These measures of damages are "not necessarily inconsistent with one another," and, "if the damages for all of those claims are the same, the damages award merges."  *Catroppa*, 267 S.W.3d at 817-18 (quotation marks omitted).

does not indicate that, if A 2 Z had not sold alternative insurance to the policyholders, they would have purchased different insurance policies that same day. At most, the testimony indicates that the policyholders would have left American National at some undefined point in the future. Until then, of course, the policyholders would have paid premiums to American National. Those premiums, and the associated lost profits, are quantifiable damages.

Indeed, the policyholders' future cancellations might have happened months later, or not at all. The policyholders' testimony is, by its nature, hypothetical. This is underscored by the fact that some witnesses testified that they *probably* would have switched insurers, and others merely stated that they would have "shopped around." For example:

> Q. And if Tommy and Colleen had not been able to give you cheaper insurance, would you have bought cheaper insurance from somewhere else?
>
> A. Well, I probably would have looked around, yeah, because I always check and see what's cheaper.

(Docket No. 281, Ex. 3 at 16.)

> Q. And, sir, were you going to make a change from American National? Whether it be through Tommy or Colleen or go to another agency, is it fair to say that you were going to change from American National?
>
> A. I was going to definitely check around. If I could beat that price, I don't see why not, you know.

(*Id.* at 109.)

> Q. [I]f they had not been able to help you, would you have tried some other agencies to get a lower premium?
>
> A. I was going to shop around, yes.

10

(*Id.* at 240.)

> Q. Now, if [the Campbells] had been unable to help you, . . . would you have gone to some other agency and kept looking?
>
> A. Most likely I probably would have changed . . . . I probably would have moved on.

(*Id.*, Ex. 4 at 232.)

> Q. If Tommy and Colleen Campbell had not been able to find you lower rates, would you have gone with another insurance company?
>
> A. Possibly, if it was the same coverage at less money.

(*Id.* at 266; *see also id.* at 150 ("If my premiums wasn't lowered, yes, I was going to change"), 160 ("I told them that I was going shopping for other insurance if they didn't get the premiums down").)

In sum, the defendants' evidence tends to show – but does not conclusively or undisputedly show – that the damages attributable to the 55 policyholders are limited. It is for the jury to decide whether, or how long, these policyholders would have stayed with American National in the absence of the defendants' conduct. Perhaps, without the defendants' help, the policyholders would have been unable to find cheaper premiums from other insurance companies for comparable policies; perhaps they would have eventually negotiated a cheaper premium with American National; perhaps they would have changed their minds about switching insurance companies;[7] or perhaps they would have sincerely intended to switch but

---

[7] The 2005 Agreement obligated Tommy Campbell "to use [his] best efforts to . . . maintain in force any business which [he] place[d] with [American National]." (Docket No. 279,

11

never actually done so. These are all conclusions that a reasonable juror could draw.

Accordingly, the court will deny the defendants' Motion for Partial Summary Judgment.

### III. Motion to Amend

The defendants have also filed a Motion to Amend their Answer to the Third Amended Complaint, pursuant to Federal Rule of Civil Procedure 15.

Rule 15 provides that, if a party seeks to amend a pleading more than 21 days after serving it, the party must receive leave from the court. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* In ruling on a motion to amend, the court considers several factors:

> Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision.
> . . . Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458-59 (6th Cir. 2001) (quoting *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989)).

#### A. Offsetting Benefits

Primarily, the defendants seek to amend their Fifth Affirmative Defense, which currently states:

> ANPAC,[8] after their termination of the Agency Agreement, took

---

Ex. 6 at 3.) Certainly, it is possible that Campbell might have been able to persuade some policyholders to remain with American National.

[8] "ANPAC" refers to American National.

over all or most of the policyholders formerly serviced by
Campbell Insurance. Subsequent to the termination, ANPAC
reassigned the policyholders to other agents but substantially
reduced the commissions these other agents would receive from
the amount of commissions that would have been paid to Campbell
Insurance. The commissions that ANPAC retained far exceed any
claim of damages by ANPAC in this case. These defendants are
entitled to set off any damages claimed by ANPAC against the
commission savings to ANPAC.

(Docket No. 176 at 14.) The defendants wish to add the following paragraphs:

ANPAC also realized substantial savings with regard to post-
termination compensation benefits for which Tommy Campbell
was qualified. As a result of the termination of the agency
agreement by ANPAC, ANPAC did not pay Tommy Campbell
post-termination compensation benefits. These Defendants are
entitled to set off the amount of the post-termination compensation
benefits to which Tommy Campbell would have been entitled
against damages claimed by ANPAC.

Savings to ANPAC, commission savings, post-termination
compensation benefit savings, and any other savings which
ANPAC realized as a result of cancellation of the agency
agreement by ANPAC are "offsetting benefits" and these
Defendants are entitled to a credit equal to those amounts.

(Docket No. 327, Ex. 1 at 16-17.)

The defendants previously asserted a counterclaim alleging that American National owed Tommy Campbell certain post-termination compensation benefits. The 1997 Agreement, in a section titled "Post-Termination Procedures," provided:

A. The Post-Termination Compensation Schedule is attached and
incorporated herein.

B. Payments will be made monthly to qualified Agents as
specified in the Post-Termination Compensation Schedule. If you
have violated any of the provisions of this Agreement or acted to
prejudice materially the interests of the Company at, before, or

13

> after termination of this Agreement, you shall forfeit all
> commissions and all other compensation due or to accrue under
> this or any previous Agreement between you and the Company.

(Docket No. 341, Ex. 1 at 5-6.) The attached schedule provided that, if Campbell met certain eligibility requirements,[9] he would receive monthly payments, beginning 60 days after "termination." (*Id.* at 16.) The size of the payments depended on Campbell's average commissions for the five years "prior to termination." (*Id.*)

The 2005 Agreement, however, did not provide for any post-termination compensation. Furthermore, it contained a "Sole Agreement" clause:

> This Agreement, with the attached Schedules and Supplements, constitutes the sole agreement and supersedes any and all prior Agreements between you[10] and the Company. This Agreement shall not impair your right to monies, if any, earned under a prior Agreement or Agreements with the Company.

(Docket No. 279, Ex. 6 at 8.)

American National previously filed a Motion for Summary Judgment, seeking dismissal of Campbell's counterclaim, which the court granted. (Docket Nos. 269, 308.) The court found that, by its plain terms, the 2005 Agreement superseded the 1997 Agreement. (Docket No. 308 at 9.) If Campbell was due any post-termination compensation, it was because he had "earned" such "monies" under the 1997 Agreement, and the 2005 Agreement permitted him to retain them. (*Id.*)

---

[9] These requirements related to Campbell's age "at termination," his years with the company, and the amount of insurance he sold. (Docket No. 341, Ex. 1 at 16-17.)

[10] The 2005 Agreement defined the terms "you" and "your" as Campbell Insurance, Inc.'s stockholders, which included Tommy Campbell. (Docket No. 279, Ex. 6 at 1.)

But the 1997 Agreement provided that Campbell would forfeit his post-termination compensation if he breached the terms of the 1997 Agreement or acted to prejudice American National's interests. It is undisputed that Campbell breached at least some of the terms of the 1997 Agreement (which terms were also contained in the 2005 Agreement) and acted to prejudice the plaintiff's interests. (*Id.* at 10-11.) Thus, the court found that Campbell had forfeited any post-termination benefits that he had accrued. (*Id.* at 11.) According to the defendants' expert, the present value of the benefits that Campbell forfeited exceeds $265,000. (Docket No. 344 at 3.)

Now, the defendants seek to raise an affirmative defense that this amount should be offset against any eventual recovery of damages. In response, the plaintiff argues that this would result in an improper measure of contract damages.

The plaintiff does not challenge the general validity of the offsetting-benefits rule, which has been incorporated into the Restatement. The Restatement provides that a breach-of-contract plaintiff can recover damages equaling the losses caused by the breach, minus "any cost or other loss that he has avoided by not having to perform." Restatement (Second) of Contracts § 347(c) (1981). The comments to that section explain: "Sometimes the breach itself results in a saving of some cost that the injured party would have incurred if he had had to perform. . . . Loss avoided is subtracted only if the saving results from the injured party not having to perform rather than from some unrelated event." *Id.* cmt. d.

The Restatement gives the following classic illustration of the rule:

> A contracts to build a house for B for $100,000. When it is partly
> built, B repudiates the contract and A stops work. A would have to

15

> spend $60,000 more to finish the house. The $60,000 cost avoided
> by A as a result of not having to finish the house is subtracted from
> the $100,000 price lost in determining A's damages. A has a right
> to $40,000 in damages from B, less any progress payments that he
> has already received.

*Id.* cmt. d, illus. 5.

Put another way, "anything of value that the plaintiff retains because of the breach, but that was to have been delivered to the defendant had the contract been performed, must be deducted from the plaintiff's gross recovery." *Tony Thornton Auction Service, Inc. v. Quintis*, 760 S.W.2d 202, 207 (Mo. Ct. App. 1988) (quoting 22 Am. Jur. 2d *Damages* § 385 and citing Restatement (Second) of Contracts § 347). *See also, e.g.*, *Louisiana Sulphur Carriers, Inc. v. Gulf Resources & Chemical Corp.*, 53 F.R.D. 458 (D. Del. 1971) ("Where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon the plaintiff . . . which he would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages." (quoting *McCormick on Damages* § 40 (1935)); *Macon-Bibb County Water & Sewerage Authority v. Tuttle/White Constructors, Inc.*, 530 F. Supp. 1048 (M.D. Ga. 1981).

The court finds that the defendants can reasonably argue that American National retained the value of the post-termination benefits solely because of Tommy Campbell's breach.[11] Before the breach, American National was obligated to pay Campbell a significant amount of compensation in the future, and, but for the breach, the plaintiff would have eventually had to

---

[11] This argument treats Tommy Campbell's entire course of conduct as a single breach; the plaintiff does not argue that it should be treated otherwise.

pay this amount.[12] Thus, although Campbell's breach allegedly damaged American National, it also allowed the company to retain a certain amount of money. This might justify applying an offset against any breach-of-contract damages eventually recovered against Campbell.[13]

---

[12] For the purposes of this Memorandum, the court will assume, without deciding, that, if Tommy Campbell had not breached the terms of the 1997 Agreement and the 2005 Agreement, he would have been eligible to receive the post-termination compensation benefits.

The plaintiff has admitted as much in previous submissions. In a brief supporting its Motion for Summary Judgment on Campbell's counterclaim, the plaintiff stated:

> As American National has testified and informed counsel for the Campbell Defendants, Mr. Campbell would have been eligible for post-termination compensation under the 2005 Agent Agreement had he not forfeited the right to such compensation by his actions in pirating American National policyholders, and assisting other of the Campbell Defendants in pirating American National policyholders, in violation of the 2005 Agent Agreement.

(Docket No. 272 at 2 n.1; *see also* Docket No. 291 at 12 (admitting "that Mr. Campbell would have been eligible for post-termination compensation had he not violated the provisions of the [2005 Agreement]").)

The plaintiff's theory in this regard is unclear. The 2005 Agreement does not directly provide for post-termination compensation, so the benefits must have originated under the terms of the 1997 Agreement. Presumably, the plaintiff believes that those benefits remained enforceable because they were "monies . . . earned" under the 1997 Agreement, which the 2005 Agreement did not erase. (*See* Docket No. 279, Ex. 6 at 8.) But, in its previous summary judgment brief, the plaintiff simultaneously argued that Campbell "earned no monies" under the 1997 Agreement, because one of the post-termination compensation eligibility requirements was that the agent be at least 55 years old "at termination" (Docket No. 341, Ex. 1 at 16), and Campbell was 52 when the 1997 Agreement was superseded in 2005. (Docket No. 272 at 6-7.) In its previous Memorandum, the court noted the plaintiff's concession without discussing the seeming contradiction in the plaintiff's positions. (*See* Docket No. 308 at 10 n.7.)

In any event, it is clear that, under the plaintiff's interpretation of its own contracts, the only thing preventing Campbell from receiving post-termination compensation is the fact that he breached the agreements.

[13] Although the parties do not discuss this point, it seems clear that only Tommy Campbell may assert the offsetting-benefits defense. Under the terms of the 1997 Agreement, only *his* breach resulted in American National's retaining the value of the post-termination compensation. (*See* Docket No. 341, Ex. 1 at 6 (providing that Campbell would forfeit the

17

The plaintiff, however, can reasonably respond that the parties specifically agreed in the contract that Campbell would forfeit the benefits if he breached the agreement and that allowing an offset would effectively circumvent this provision. (*See* Docket No. 340 at 1-2.) Indeed, the plaintiff argues that "American National [has] fully performed its obligations under the post-termination compensation clause," because it has "paid the Campbell Defendants exactly what the contract calls to be paid" – nothing. (*Id.* at 3-4.) Unlike the illustration contained in the Restatement, American National's retention of the compensation was caused not by Campbell's repudiation of the contract, but instead by the application of a specific contractual clause. The plaintiff cites *Ford v. American Express Financial Advisors, Inc.*, 98 P.3d 15 (Utah 2004), for the proposition that the offsetting-benefits doctrine does not apply when a plaintiff has fully performed under the relevant contract.[14]

---

compensation "[i]f [*Campbell*] ha[s] violated any of the provisions of this Agreement" (emphasis added)).) The contractual breaches by the other defendants were irrelevant to the 1997 Agreement's compensation clause.

[14] The plaintiff further argues that a liquidated damages provision prevents the application of the offsetting-benefits doctrine. In a section titled "Policy Rollover," the 2005 Agreement provides that "Agent shall be obligated to reimburse the Company for premium losses." (Docket No. 279, Ex. 6 at 7.) The plaintiff claims that this is a liquidated damages provision (Docket No. 313 at 8-9; Docket No. 332 at 2-6) and that the offsetting benefits doctrine is inapplicable when a plaintiff is suing to recover liquidated damages (Docket No. 340 at 8-9 (citing *Eureka Dev., Inc. v. Port Jefferson Realty, LLC*, No. 4:05CV1281, 2007 U.S. Dist. LEXIS 74046, at *8-9 (E.D. Mo. Oct. 3, 2007)).

But, by its plain terms, the supposed liquidated damages provision only requires that "*Agent*" shall pay premium losses. The 2005 Agreement specifically defines "Agent" as Campbell Insurance, Inc. – not as Tommy or Colleen Campbell. (Docket No. 279, Ex. 6 at 1.) Instead, those individuals are identified as "Agent's Stockholders." (*Id.*) Because the clause does not purport to define the damages that Tommy Campbell, as an individual, must pay if he breaches the contract, it does not prevent him from raising an offsetting-benefits defense.

18

The court need not definitively resolve the parties' legal arguments at this point. It is enough that Tommy Campbell has a colorable argument that his proposed affirmative defense is viable and that, therefore, the amendment would not be futile. Because the plaintiff does not argue that it is otherwise surprised or unduly prejudiced by the proposed amendment to the Fifth Affirmative Defense, the court will grant leave for the defendants to amend this defense.

### B. Other Proposed Amendments

The defendants also seek to add a Twelfth Affirmative Defense, which would state: (1) that the defendants deny that the plaintiff is entitled to recover punitive damages; (2) that any punitive damages award must be limited as set forth in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003); and (3) that the defendants request a bifurcated trial regarding punitive damages. (Docket No. 327, Ex. 1 at 18.) These amendments are unnecessary, because the defendants' current Answer already denies that the plaintiff is entitled to punitive damages (Docket No. 176 ¶¶ 130, 139, 149) and because the other statements are not affirmative defenses that must be listed in an answer, *see* Fed. R. Civ. P. 8(c)(1). Nevertheless, the plaintiff will not be prejudiced by their inclusion.

Finally, the defendants seek to amend their responses to various factual allegations in the Third Amended Complaint. The defendants claim that these changes are "warranted by [their] further investigation and discovery to date." (Docket No. 328 at 2.) Most of these amendments involve changing the defendants' previous denials to admissions or qualified denials. Again, it does not appear that these changes will prejudice the plaintiff.

Because the proposed amendments will not unduly prejudice the plaintiff, the court will

grant the defendants' Motion to Amend in its entirety.[15]

## **CONCLUSION**

For all of the reasons discussed above, the court will deny the Campbell Defendants' Motion for Partial Summary Judgment and will grant their Motion to Amend.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[15] The court previously denied a Motion to Amend filed by the defendants that included some of the amendments that are proposed in the current Motion to Amend. (Docket Nos. 301, 309.) The denial, however, was premised entirely on the futility of the defendants' attempt to amend Tommy Campbell's counterclaim. (Docket No. 308 at 11.) That decision has no bearing on the outcome of the current Motion to Amend.