AMERICAN NATIONAL PROPERTY AND )
CASUALTY COMPANY, )
                              )
      Plaintiff, )
                              )
v. )        **Case No. 3:08-cv-00604**
                              )        **Judge Trauger**
CAMPBELL INSURANCE, INC., *et al.*, )
                              )
      Defendants. )

## MEMORANDUM

Pending before the court are a number of motions: (1) American National's[1] Motion for

Summary Judgment regarding its claims against the Campbell Defendants (Docket No. 402), to

which the Campbell Defendants have filed a response (Docket No. 429), and in support of which

the plaintiff has filed a reply (Docket No. 462); (2) American National's Motion for Summary

Judgment regarding its claims against Montgomery (Docket No. 406), to which Montgomery has

filed a response (Docket No. 428), and in support of which the plaintiff has filed a reply (Docket

No. 461); (3) the Campbell Defendants' Motion for Summary Judgment (Docket No. 393), to

which the plaintiff has filed a response (Docket No. 447), and in support of which the Campbell

Defendants have filed a reply (Docket No. 457); (4) Montgomery's Motion for Summary

---

[1] Throughout this Memorandum, the court will refer to plaintiff American National
Property and Casualty Co. as "American National," to defendants Campbell Insurance, Inc., A 2
Z Insurance, Inc., Tommy Campbell, and Colleen Marsha Campbell, collectively, as the
"Campbell Defendants," and to Liberty Mutual Insurance Co. and Montgomery Mutual
Insurance Co., collectively, as "Montgomery."

Judgment (Docket No. 397), to which the plaintiff has filed a response (Docket No. 445), and in support of which Montgomery has filed a reply (Docket No. 459); and (5) American National's Rule 56(d) Motion to Deny Summary Judgment (Docket No. 425), to which Montgomery has filed a response and a sur-reply (Docket Nos. 455 and 475), and in support of which the plaintiff has filed a reply (Docket No. 470).

For the reasons discussed below, the plaintiff's motions will be denied and the defendants' motions will be granted in part and denied in part.

## FACTS

The plaintiff, American National, is an insurance company that formerly contracted with defendants Tommy Campbell ("Campbell"), Marsha Colleen Campbell ("Colleen Campbell") (collectively, the "Campbells"), and Campbell Insurance, Inc. ("Campbell Insurance") to act as insurance agents.[2] This case arises from those defendants' decision to leave American National and to begin selling insurance policies for American National's competitors.

In 1997, defendant Tommy Campbell signed an insurance agent agreement with American National (the "1997 Agreement"), and his wife, Colleen Campbell, signed a substantively identical agreement. Throughout the duration of their relationship with American National, the Campbells were exclusive, or "captive," agents, meaning that they were

---

[2] Unless otherwise noted, the facts are drawn from the parties' statements of fact, responses thereto, and related exhibits (Docket Nos. 394, 401, 405, 430, 431, 442, 443, and 460). The court also draws upon the statements of fact in the court's previous memoranda regarding the parties' motions for summary judgment. (Docket Nos. 308 and 350.) The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

contractually restricted from placing insurance with other insurance companies.  They prospered, and, in 2000, they incorporated their agency as Campbell Insurance, Inc.

In 2005, American National and the Campbells signed a corporate agent agreement designating Campbell Insurance as an exclusive agent (the "2005 Agreement").  The agreement was signed by both Tommy and Colleen Campbell, who were the sole shareholders of Campbell Insurance, and it superseded all previous agreements between the Campbells and American National.  The Campbells also contemporaneously executed a guaranty in which they guaranteed Campbell Insurance's liabilities.

Many provisions of the 2005 Agreement spoke in terms of "you" or "your," and it defined those terms as "[Campbell Insurance's] Stockholder(s) whether one or more individuals."  (Docket No. 279, Ex. 6 at 1.)  Other provisions pertained to "Agent," which was defined as Campbell Insurance.  (*Id.*)

The 2005 Agreement restricted the Campbells' actions in a number of ways.  Specifically, a section titled "Your Responsibilities" provided:

> You agree to use your best efforts to provide services to customers and to maintain in force any business which you place with the Company.  You will use your best efforts to present a favorable public image of the Company and to actively represent the Company's best interests.

(*Id.* at 3.)  The agreement further provided, in a section titled "Limitation on Authority":

> 1.  You have only the power or authority which this Agreement specifically grants to you.  You will not assume that any power or authority is implied.  In general, you are denied all power and authority not specifically granted, including, but not limited to, the following: . . .

> b) Either directly or indirectly write or service by or through any solicitor, partner, Agent, firms, or broker insurance for any other property and casualty company . . . .
>
> c) Induce or influence any policyholder to lapse, cancel, or replace any insurance policy of the Company. . . .
>
> k) Participate in joint office arrangements with Agents or representatives of other insurance companies. This would include sharing office space or agency expenses with Agents, brokers, or representatives of other insurance companies.

(*Id.* at 4-5.)

The 2005 Agreement also provided a one-year non-compete period upon termination:

> If this Agreement is terminated, whether by you or by the Company, with or without cause, you agree that you will not, for a period of one (1) year after termination, either directly or indirectly, by or through any partner, Agent, employer or firm on your behalf, induce or try to induce any policyholder to lapse, cancel or replace any insurance policy of the Company.

(*Id.* at 6.) Similarly, the agreement contained a section titled "Policy Rollover," which provided, in relevant part:

> B. . . . [T]he Agent covenants and agrees that upon receipt of notice of termination or upon termination of this Agreement (whichever occurs first), . . . the Agent will not directly, or indirectly through any partner, Agent, employee, or firm on the Agent's behalf, solicit or accept any property or casualty insurance from any policyholder of the company whose business they wrote, solicited, serviced, or sold while a representative of the Company.
>
> C. The Agent will not advise, induce, or attempt to induce any such policyholder to lapse, cancel, or replace any policy of the Company.
>
> D. ONE YEAR
> These prohibitions shall last for a period of <u>one year</u> following the termination of this Agreement . . . .

(*Id.* at 7.)

Finally, the 2005 Agreement contained a provision titled "Exclusive Ownership of

'Business' and Rights of Files":

> "Business" shall mean all accounts, records, policy files, and client
> information maintained or in the possession of the Agent.
> Business includes all accounts, records, files, policies, rates,
> information regarding names, addresses, and ages of policyholders;
> the description and location of insured property; and expiration or
> renewal dates (x-dates) of policies acquired or coming into the
> Agent's possession during the effective period of this Agreement
> or any prior Company Agreement. These are **trade secrets** wholly
> owned by the Company.
>
> All Company "Business" . . . shall be the sole and exclusive
> property of the Company and shall immediately be returned to the
> Company . . . upon termination of this agreement . . . .

(*Id.* at 4.)

By 2007, the Campbells believed that they could make more money as independent, non-

exclusive insurance agents. On November 1, 2007, Colleen Campbell resigned from Campbell

Insurance and transferred her shares of the corporation to Tommy Campbell, leaving him as the

president and sole shareholder of the company. She then formed defendant A 2 Z Insurance, Inc.

("A 2 Z"), a purportedly separate insurance agency.

In the months following November 2007, Tommy Campbell assisted Colleen Campbell

in her efforts to contract with insurance companies, and, ultimately, A 2 Z secured relationships

with some of the plaintiff's competitors. In late 2007 and early 2008, all of A 2 Z's business was

conducted by Campbell Insurance employees, with Campbell Insurance paying their wages. The

lines between the companies were blurred; for example, Campbell Insurance purchased a new

online agency management system for A 2 Z's exclusive benefit. In addition, Tommy Campbell allowed Colleen Campbell and other A 2 Z employees to access American National's proprietary customer online database. The court has already found that Tommy Campbell's actions during this time period violated certain provisions of the 2005 Agreement. (Docket No. 308 at 10-11.)

One of the insurance companies that contracted with A 2 Z was defendant Montgomery. In late 2007 or early 2008, the Campbells contacted Montgomery regarding the possibility of A 2 Z operating as a non-exclusive Montgomery agent. Morris Smith, a Montgomery territory manager, met with the Campbells in January 2008. At his deposition, Smith testified that he understood that Campbell Insurance was a captive agency for American National but that A 2 Z had no relationship with American National.[3] He further testified that he did not know that the 2005 Agreement contained any prohibitions on the Campbells' actions as individuals or on A 2 Z's actions. Smith did not receive, nor did he ask for, the 2005 Agreement between Campbell Insurance and American National. Ultimately, Montgomery Regional Vice President Donna Egyed approved A 2 Z's application and appointed A 2 Z as a Montgomery agent. At their depositions, Montgomery's employees uniformly testified that, although they knew that Campbell Insurance was a captive agency, they did not review the 2005 Agreement and they did not know that the Campbells or A 2 Z might have been restricted by that contract.

During the application process, the Campbells met with other Montgomery employees and discussed the possibility that A 2 Z might convert current American National policyholders to Montgomery. During a meeting with Brent Potts, a personal line agency specialist for

---

[3] Montgomery does not use captive agencies; all of its agencies are non-exclusive.

Montgomery, the Campbells provided him with insurance documents called declaration pages. The declaration page for a given policy lists the policyholder's name, address, policy number, coverage and rate information, and policy expiration date, as well as a description of the insured property. The information from these pages allowed Montgomery to formulate competitive price quotes.[4] Moreover, knowledge of the policies' expiration dates allowed Montgomery and A 2 Z to more effectively target customers, because customers are more likely to switch insurance companies when their policies are expiring. Potts testified at his deposition that it was normal for him to review declaration pages when evaluating new agency applicants.

As a result of the Campbells' actions, the number of American National policies written through Campbell Insurance dropped precipitously. Between October 2007 and June 2008, 252 American National policyholders cancelled or switched their policies, a rate that exceeded the statistical norm. Overall, through July 15, 2009, the plaintiff's damages expert has identified 558 American National insurance policies that were canceled and replaced by new policies sold by A 2 Z. Of those, 204 were replaced by Montgomery policies.

After some investigation, American National discovered the existence of A 2 Z. On June 10, 2008, American National terminated the 2005 Agreement and its relationship with Campbell Insurance. Soon after, Tommy Campbell and the remaining Campbell Insurance employees became employees of A 2 Z, and Campbell Insurance has since been effectively dissolved. The plaintiff's damages expert has calculated the damages attributable to the customers that

---

[4] Montgomery maintains that it received approximately 20 declaration pages, while the plaintiff claims that the Campbells sent or committed to send over 100 pages.

American National lost to A 2 Z as approximately $395,000. (Docket No. 371 at 1.) This figure represents the expert's projection of the plaintiff's lost profits from 2008 through 2014.

American National filed this suit on June 17, 2008, one week after terminating the 2005 Agreement. Its Third Amended Complaint contains claims for: (1) breach of contract against the Campbells and Campbell Insurance; (2) interference with business relationships against all defendants; (3) procurement of breach of contract against the Campbells, A 2 Z, and Montgomery; (4) violation of the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701 *et seq.*, against all defendants; (5) breach of fiduciary duty against the Campbells and Campbell Insurance; (6) unfair competition against all defendants; (7) violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq.*, against all defendants; and (8) civil conspiracy and "concert of action" against all defendants. (Docket No. 160 at 22-33.) The plaintiff also seeks to pierce the corporate veil with regard to Campbell Insurance and A 2 Z.

American National, the Campbell Defendants, and Montgomery have each filed motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56, regarding these claims. American National has also filed a Rule 56(d) motion seeking denial of Montgomery's Motion for Summary Judgment because of allegedly insufficient discovery.

## ANALYSIS

### I.    Summary Judgment Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Conversely, a moving plaintiff must show that the defendant cannot raise a genuine issue of fact regarding any element of the relevant claims.  In both instances, "[i]n evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party."  *Moldowan*, 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249, 252.  An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     Motions Related to the Claims Against Montgomery

American National and Montgomery have filed cross-motions for summary judgment regarding the claims against Montgomery.  The court will address each claim in turn.

### A.     Procurement of Breach of Contract

Both parties argue that summary judgment is appropriate on the plaintiff's procurement of breach of contract claim.  Montgomery primarily argues that the claim fails because it had no

knowledge of the Campbells' contract with American National and because American National

suffered no damages from Montgomery's actions.

Tennessee law provides both a statutory and a common-law cause of action for

procurement of breach of contract.[5] The primary difference between the two is that the statute,

Tenn. Code Ann. § 47-50-109, mandates treble damages, while the common law allows recovery

of punitive damages. *Givens v. Mullikin*, 75 S.W.3d 383, 405 (Tenn. 2002). To recover on a

procurement claim, the plaintiff must prove seven elements:

> (1) that a legal contract existed; (2) that the defendant was aware
> of the contract; (3) that the defendant intended to induce a breach
> of that contract; (4) that the defendant acted with malice; (5) that a
> breach of the contract occurred; (6) that the breach was a
> proximate result of the defendant's conduct; and (7) that the breach
> injured the plaintiff.

*Id.*

Montgomery points out that, because it did not deal with Campbell Insurance, the

plaintiff must show that it procured a breach of contract by Tommy Campbell.[6] (Docket No. 400

at 8.) The primary issue raised by Montgomery is whether it knew that the Campbells, as

individuals, were parties to a contract with American National. Montgomery argues that,

although it knew that *Campbell Insurance* was a captive agent for American National, it was

unaware of the existence of any contract that bound the *Campbells themselves*. (*Id.* at 9.) Thus,

Montgomery argues, American National cannot prove the second element of the claim, which

---

[5] All parties agree that Tennessee law governs the plaintiff's non-contract claims.

[6] As explained later in this Memorandum, the court finds that Colleen Campbell was not
bound by any provision of the 2005 Agreement during the relevant time period. Thus, the
plaintiff must show that Montgomery procured Tommy Campbell's breach of contract.

requires that the defendant was aware of the relevant contract.

The plaintiff counters that, when a defendant knows of a contract between the plaintiff and a third party, the defendant "is on notice as to the terms of the agreement and has a duty to learn whether his actions will cause the [third party] to breach his agreement.'"[7] *JIT Concepts, Inc. v. Shelby County Healthcare Corp.*, 358 F. Supp. 2d 678, 686 (W.D. Tenn. 2005) (quoting *Wells Fund I v. The Shoe Show of Rocky Mount, Inc.*, 863 S.W.2d 731, 733 (Tenn. Ct. App. 1993)). "[T]he alleged inducer 'may not close its eyes and ears and thereafter claim a lack of knowledge when the [contract] could have been easily obtained from [the plaintiff].'" *Id.* (quoting *Wells Fund I*, 863 S.W.2d at 733-34) (third alteration in original). This accords with the law of other jurisdictions. *E.g.*, *Rain Bird Corp. v. Nat'l Pump Co.*, No. 2:02CV018, 2003 U.S. Dist. LEXIS 26792, at *49 (N.D. Miss. Dec. 23, 2003) ("A finding of willful ignorance is sufficient to infer knowledge of the contract."); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 764 (Iowa 1999) (Approving jury instruction stating that, for the knowledge element, "[i]t is sufficient that the Defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to the disclosure of the [plaintiff's] contractual relationship"); *Major Computer, Inc. v. Academy Life Ins. Co.*, 929 F.2d 1249, 1252 (8th Cir. 1991) ("'It is enough to show that defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and the rights of the parties.'" (quoting *Swaney v. Crawley*, 191 N.W. 583, 584 (Minn. 1923)).

---

[7] Montgomery's citation to *Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73, 87 n.10 (Tenn. 2001), which generally discusses the difference between intentional torts and negligence, is inapposite.

It is undisputed that Montgomery, through its employees, knew that: (1) a contract existed between Campbell Insurance and American National; (2) Campbell Insurance was a captive agency, meaning that it was prohibited from selling insurance policies from American National's competitors; and (3) Tommy Campbell was the sole owner and principal of Campbell Insurance. In light of this knowledge, it is a question of fact whether Montgomery also knew that the contract between Campbell Insurance and American National placed limits on Tommy Campbell's conduct. It seems obvious that, if an insurance company has an exclusive relationship with a closely held agency, the contract between the two will include provisions prohibiting the agency's owner and principal from competing against the insurance company, at least throughout the duration of the relationship. In addition, Montgomery easily could have obtained a copy of the 2005 Agreement from the Campbells. Consequently, despite the contrary testimony of Montgomery's employees, a reasonable juror could conclude either that Montgomery actually knew that a contract existed between Tommy Campbells and American National or that Montgomery knew enough to place it on notice that the 2005 Agreement contained provisions limiting Tommy Campbell's conduct.[8]

Montgomery further argues that the procurement claim must fail because the Campbells initially approached Montgomery, rather than the other way around; thus, the defendant claims,

---

[8] Montgomery argues that this stretches the rule discussed in *JIT Concepts* "beyond all logical or reasonable bounds." (Docket No. 428 at 10.) The court disagrees. The point of the rule is to prevent defendants from benefiting from their own willful ignorance. Here, Montgomery admittedly knew that the relevant contract existed; it simply failed to inquire as to the exact parties bound by that contract, even though it was apparent that the contract probably contained provisions binding the Campbells. Under the circumstances, a reasonable juror could find that this failure to inquire amounted to willful ignorance.

it could not possibly have intended to induce any breach.[9]  (Docket No. 400 at 9.)  But the question of whether Montgomery ever sought to induce a breach is not resolved by the mere fact that the Campbells initiated contact.  The intent element is fulfilled if, after the parties' introduction, Montgomery offered commissions to the Campbells in the hope that Tommy Campbell would breach his contractual duties by assisting A 2 Z and Montgomery in converting existing American National policyholders.  There is sufficient evidence to support a finding that Montgomery did so.

Next, Montgomery argues that, because A 2 Z contracted with more than 50 other insurance companies, Montgomery's actions were not a proximate cause of any breach.  (Docket No. 400 at 9-10.)  According to Montgomery, had it not dealt with the Campbells, the 204 Montgomery policies written by A 2 Z would simply have been written on behalf of one of American National's other competitors.

Tennessee employs a three-pronged test for analyzing proximate cause:

> (1) [T]he tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there [must be] no rule or policy that should relieve the wrongdoer from liability . . . ; and (3) the harm giving rise to the action [must] have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn. 2005).  Here, Montgomery's conduct was obviously a substantial factor in the Campbells' decision to sell Montgomery policies, and the harm to American National was reasonably foreseeable.  Thus, if the jury concludes that

---

[9] Notably, Montgomery cites no case law in support of this theory.

Montgomery offered commissions to the Campbells, despite knowing that Tommy Campbell's efforts would breach his contractual duties, the jury could further conclude that such conduct was the proximate cause of Campbell's breach. Any assertion that A 2 Z would have sold other companies' policies to the converted policyholders is speculative; at best, the defendant's arguments highlight factual issues that the jury must decide.

Montgomery also argues that there is no evidence to support the fourth element of the procurement claim, which requires that the defendant acted with "malice." (Docket No. 400 at 8-9.) In this context, malice means "the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent." *B&L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 219 (Tenn. Ct. App. 2004) (quotation marks omitted). If a defendant intends to gain business from a breaching third party, and if the breach necessarily inflicts injury upon the plaintiff, that is enough to imply an evil intent. *Id.*; *see also AmeriGas Propane v. Crook*, 844 F. Supp. 379, 389 (M.D. Tenn. 1993) ("[M]alice does not require ill will or spite toward Plaintiff. Malice is demonstrated simply by conduct that is 'the willful violation of a known right.'"). Here, it is undisputed that Montgomery intended to gain business from the Campbells' existing customers at American National's expense. Under *B&L Corp.*, this is enough to support the malice element.

Finally, Montgomery argues that American National cannot show that it has suffered any damages as a result of Montgomery's actions. (Docket No. 400 at 10-11.) On a procurement claim, "the damages awarded to the plaintiff must be based on the direct and proximate result of the wrongful acts of the person procuring the breach of contract." *Dorsett Carpet Mills, Inc. v.*

*Whitt Tile & Marble Distrib. Co.*, 734 S.W.2d 322, 324 (Tenn. 1987). "[A]n injured party may recover lost anticipated profits when their nature and occurrence have been established with reasonable certainty." *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004).

The plaintiff's damages expert has calculated the lost profits attributable to policyholders who switched from American National to Montgomery. The expert took the premiums that the policyholders would have paid to American National between 2008 and 2014 and applied an 8.1 percent profit margin, which was based on the plaintiff's overall profitability in 2005, 2006, and 2007, to calculate lost profits. Montgomery attacks the expert's calculations in two ways. First, it argues that the 8.1 percent profit margin figure is incorrect, because, overall, American National actually lost money in 2008 and 2009. Second, it argues that a six-year damages period is too long, because, after the one-year non-compete period, the Campbells would have been free to solicit the policyholders, and the policyholders would have switched at that time. In both instances, Montgomery has raised factual issues that are not amenable to resolution on summary judgment.

In sum, neither side has shown that summary judgment is appropriate. Montgomery has not shown that any element of the plaintiff's claim necessarily fails, and the plaintiff, at a minimum, has not shown that Montgomery necessarily knew of the existence of the contract between the Campbells and American National. Accordingly, the procurement of breach of contract claim against Montgomery will remain for trial.

### B. Tennessee Consumer Protection Act

Montgomery argues that the plaintiff's TCPA claim is meritless. (Docket No. 400 at 12-15.) The TCPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). Montgomery argues that its actions were not "deceptive" or "unfair," as those terms are used in the statute.[10]

"A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact," and "the essence of deception is misleading consumers by a merchant's statements, silence, or actions." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005). The concept of unfairness is broader; an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* at 116-17 (quotation marks omitted). "To be considered 'substantial,' consumer injury must be more than trivial or speculative." *Id.* at 117. The TCPA lists 26 types of conduct that constitute deceptive or unfair practices,[11] Tenn. Code Ann. §§ 47-18-104(b)(1)-(26), as well as a catch-all provision

_____

[10] In April 2011, the Tennessee legislature passed an amendment to the Tennessee Unfair Trade Practices and Unfair Claims Settlement Act of 2009, Tenn. Code Ann. § 56-8-101 *et seq.*, which regulates insurers. The new law provides that "the sole and exclusive statutory remedies and sanctions applicable to an insurer . . . for alleged unfair or deceptive acts or practices in connection with . . . a contract of insurance" shall be contained in Titles 56 and 50 of the Tennessee Code. 2011 Tenn. Pub. Acts, ch. 180, § 1. This removes insurance companies from the scope of the TCPA, which is contained in Title 47.

The law further provides, however, that it "shall take effect upon becoming a law . . . and shall apply to any cause of action accruing on or after such date." *Id.*, § 2. Here, the relevant acts occurred in 2007 and 2008, so the new law is inapplicable.

[11] These include, for example, "[f]alsely passing off goods or services as those of another" and "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." Tenn. Code Ann. §§

prohibiting "any other act or practice which is deceptive to the consumer or to any other person," *id.* § 47-18-104(b)(27).

Montgomery correctly points out that the gravamen of the plaintiff's claims against it is that Montgomery engaged in underhanded tactics to steal American National's customers. Although the Tennessee legislature drafted the TCPA to prohibit "unfair or deceptive acts or practices in or affecting commerce," the legislature declined to prohibit "*unfair methods of competition* in or affecting commerce." *Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 754 (Tenn. Ct. App. 2006) (citing *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 Tenn. App. LEXIS 539, at *105 (Tenn. Ct. App. July 31, 2003)) (emphasis added); *see also Tucker*, 180 S.W.3d at 115 n.6 (noting that the TCPA fails to prohibit "unfair methods of competition"); *PHG Techs., LLC v. St. John Cos.*, 459 F. Supp. 2d 640, 645 (M.D. Tenn. 2006) ("The Tennessee General Assembly chose not to include within the TCPA's prohibitions unfair competition or anti-competitive acts."). The court must "'presume . . . that the Tennessee General Assembly knowingly chose not to include . . . anticompetitive conduct as actionable under the TCPA.'" *Bennett*, 198 S.W.3d at 754 (quoting *Sherwood*, 2003 Tenn. App. LEXIS 539, at *110).

The plaintiff has presented no evidence that Montgomery's actions deceived or injured any consumer. At worst, the evidence shows that Montgomery tortiously caused the plaintiff's agents to work against the plaintiff's interests and used trade secrets to undercut the plaintiff's prices. These are unfair methods of competition, which are not prohibited by the TCPA. If

---

47-18-104(b)(1)-(2).

anything, policyholders who switched to Montgomery actually benefited from the lower prices they received.

The plaintiff argues that Montgomery's conduct was potentially deceptive in three ways. First, it claims that Montgomery's actions "caused a likelihood of confusion or misunderstanding amongst policyholders as to the source, affiliation, connection, or sponsorship of their insurance provider." (Docket No. 445 at 19 n.3.) But there is no evidence that the policyholders who bought Montgomery policies failed to understand that they were switching away from American National.[12] Second, the plaintiff claims that Montgomery might have "disparaged American National's services or business through false or misleading statements to . . . policyholders." (*Id.*) Although the TCPA does expressly permit actions based on misleading disparagement of competitors, Tenn. Code Ann. § 47-18-104(b)(8), there is no evidence to suggest that Montgomery made false statements regarding American National. Nor is there any obvious reason why it would need to; Montgomery sold its policies by undercutting American National's prices and targeting customers whose policies were expiring.[13]

---

[12] In fact, the Campbell Defendants have previously submitted sworn testimony from 55 policyholders that the policyholders canceled their American National policies because of high premiums. (Docket No. 281, Exs. 3-4.) Clearly, those consumers were aware that they were switching to a competing insurance company.

[13] The plaintiff has filed a motion, pursuant to Rule 56(d), to deny or defer consideration of Montgomery's Motion for Summary Judgment with regard to the TCPA claim. *See* Fed. R. Civ. P. 56(d) (allowing the court to deny a motion for summary judgment if the nonmovant shows that, "for specified reasons, it cannot present facts essential to justify its opposition"). At the time the plaintiff filed its Rule 56(d) motion, its previously filed motion to compel was pending. The plaintiff characterizes that motion to compel as seeking production of "communications the Campbell Defendants and [Montgomery] had with [the plaintiff's former] customers that induced or otherwise caused them to terminate their relationships with Plaintiff." (Docket No. 425 at 1; *see also* Docket No. 375.) The plaintiff argues that, without these

Third, the plaintiff argues that Montgomery deceived customers by not notifying them "that it was viewing their confidential information." (Docket No. 445 at 17.) Although the information reviewed by Montgomery might have constituted trade secrets (as discussed further below), it was not "confidential" or sensitive from the policyholder's point of view. The declaration page for a given policy listed the policyholder's name, address, policy number, coverage and rate information, and policy expiration date, as well as a description of the insured property. In other words, Montgomery merely reviewed basic information regarding certain American National policies. This did not harm the policyholders in any tangible or substantial way, and it was not deceptive for Montgomery to not specifically mention this review.

---

documents, it cannot show that Montgomery violated the TCPA by making deceptive statements to policyholders.

The court will deny the plaintiff's Rule 56(d) motion. The most relevant documents sought by the motion to compel, which the Magistrate Judge has since granted in part (Docket No. 471 at 6-7), were the Campbell Defendants' files regarding certain policyholders who canceled their American National policies. But the plaintiff admittedly already had access to these files, as they existed in April 2009. (Docket No. 389 at 5; *see also* Docket No. 383 at 3-4.) Thus, the plaintiff has already had an opportunity to review the files for potentially deceptive statements made by Montgomery in 2008, and there is no reason to delay resolution of Montgomery's Motion for Summary Judgment.

In response to the Rule 56(d) motion, Montgomery seeks attorney's fees from the plaintiff, arguing that the TCPA claim is frivolous. (Docket No. 455 at 5.) The TCPA expressly allows an award of attorney's fees if a plaintiff's action "is frivolous, without legal or factual merit, or brought for the purpose of harassment." Tenn. Code Ann. § 47-18-109(e)(2). Such an award is only appropriate when the plaintiff's claim is "so utterly lacking in an adequate factual predicate or legal ground as to make the filing of such a claim highly unlikely to succeed." *Glanton v. Bob Parks Realty*, No. M2003-01144-COA-R3-CV, 2005 Tenn. App. LEXIS 263, at *30 (Tenn. Ct. App. Apr. 27, 2005). The decision to award fees is within the court's discretion. *Id.* at *29.

The court will deny Montgomery's request for attorney's fees. Although the court is dismissing the plaintiff's TCPA claim, that claim is not so frivolous that it merits a fee award. Certainly, the plaintiff has submitted evidence that Montgomery's conduct was otherwise tortious; it was thus not unreasonable for the plaintiff to assert an add-on TCPA claim.

In sum, the plaintiff cannot show that Montgomery's conduct was "deceptive" or "unfair," as those terms are used in the TCPA. Accordingly, the court will dismiss the TCPA claim against Montgomery.

### C.     Tennessee Uniform Trade Secrets Act

Montgomery argues that the plaintiff's trade secrets claim against it should be dismissed. (Docket No. 400 at 15-21.) The Campbell Defendants make similar arguments in their Motion for Summary Judgment regarding the trade secrets claim against them (Docket No. 395 at 20-30), so the court will address all of the defendants' arguments in this section.

In 2000, Tennessee adopted the TUTSA, which prohibits the misappropriation of trade secrets. *Hamilton-Ryker Group, LLC v. Keymon*, No. W2008-00936-COA-R2-CV, 2010 Tenn. App. LEXIS 55, at *37-38 (Tenn. Ct. App. Jan. 28, 2010); Tenn. Code Ann. §§ 47-25-1703 to -1704. The statute defines a "trade secret" as information that: (1) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use"; and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* § 47-25-1702(4)(A)-(B). In analyzing trade secrets, Tennessee courts employ a six-factor test, which essentially restates the requirements in the statutory definition:[14]

> (1) the extent to which the information is known outside of the
> business; (2) the extent to which it is known by employees and

---

[14] Although the TUTSA preempts any inconsistent previous case law, its definition of "trade secret" is broad enough to cover information that was, under common law, protectable as confidential information. *Hamilton-Ryker*, 2010 Tenn. App. LEXIS 55, at *39-40.

others involved in the business; (3) the extent of measures taken by
the business to guard the secrecy of the information; (4) the value
of the information to the business and to its competitors; (5) the
amount of money or effort expended by the business in developing
the information; (6) the ease or difficulty with which the
information could be properly acquired or duplicated by others.

*Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 983 (M.D. Tenn. 2008) (citing *Wright*

*Med. Tech., Inc. v. Grisoni*, 135 S.W. 3d 561, 589 (Tenn. Ct. App. 2001)).

The plaintiff claims that the information used by the Campbells and Montgomery in their

efforts to solicit American National's customers – in particular, Campbell Insurance's collection

of policy declaration pages – constituted trade secrets.  Those declaration pages contained

information about specific policyholders, including their names, contact information, coverage

and rate information, and policy expiration dates.  Although this information was clearly

designated as "trade secrets" by the 2005 Agreement, a party's own designation is not

dispositive.  *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 814 (E.D. Tenn. 2005)

("[T]he fact that particular information . . . may have been deemed 'secret' or 'confidential' by

its owner does not necessarily mean that information will qualify as a trade secret.").

Accordingly, the court must analyze whether the collection of declaration pages and customer

files meets the statutory definition of "trade secret."

First, the plaintiff has submitted evidence showing that its collection of declaration pages

is economically valuable.  It is clear that policy pricing information and expiration dates allow

competitors to more effectively target American National's policyholders; this is demonstrated

by the mere fact that Montgomery sought copies of the declaration pages and successfully used

the information contained therein to convert policyholders.  *See Hamilton-Ryker*, 2010 Tenn.

App. LEXIS 55, at *42 ("[T]he speed with which [the defendant] utilized this information to begin competing directly with [the plaintiff] . . . demonstrates its independent economic value."); *1st Am. Sys. v. Rezatto*, 311 N.W.2d 51, 58 (S.D. 1981) ("[E]xpiration dates . . . are valuable in the highly competitive insurance business since policies are seldom cancelled during their term."). (*See* Docket No. 445, Ex. 2 at 164-65 (testimony from a Montgomery employee that efforts were made to target customers with expiring policies because, "realistically, if you want to write that business for that person, you need to . . . be able to provide them with that quote before their renewal date").) This customer information essentially provides a roadmap to competitors regarding which policyholders to target and how to undercut American National's prices. Without access to the declaration pages, it would have been more difficult for Montgomery and A 2 Z to successfully solicit the plaintiff's customers.

Second, the plaintiff has submitted evidence that the information at issue is not easily reproduced by outsiders.[15] American National's customer list, policy-specific pricing information, and expiration dates are not disclosed to the general public. Without access to American National's internal information, there appears to be no feasible way for its competitors to acquire this information. It is true that a competitor could ask each individual policyholder about the details of his or her policy, but this presupposes that the competitor could identify the policyholders in the first place. Given the broad market for property and casualty insurance,

---

[15] In addition, even if the information could theoretically have been developed without misappropriation, "'it may be protectible if the former employee does not develop it by independent [means] but in fact obtains his knowledge . . . from his former employer and then uses this knowledge to compete with the former employer.'" *Hamilton-Ryker*, 2010 Tenn. App. LEXIS 55, at *42 (quoting *Grisoni*, 135 S.W.3d at 589) (alteration and ellipses in original).

there is no effective way to do this, short of cold-calling thousands of people.[16]  And even if

competitors could gain access to scattered information about isolated policies, "the *aggregate* of

the information [possessed by the plaintiff] . . . may be considered a trade secret."  *Hamilton-*

*Ryker*, 2010 Tenn. App. LEXIS 55, at \*41 (citing *Grisoni*, 135 S.W. 3d at 589) (emphasis

added).  Here, the relevant information is the *collection* of declaration pages and customer files

available to Campbell Insurance, from which the Campbell Defendants were able to identify and

relay specific targets to Montgomery.[17]

The Campbell Defendants rely on two Tennessee cases, *Heyer-Jordan & Assoc., Inc. v.*

*Jordan*, 801 S.W.2d 814 (Tenn. Ct. App. 1990), and *Amarr Co. v. Depew*, No.

03A01-9511-CH-00412, 1996 Tenn. App. LEXIS 660 (Tenn. Ct. App. Oct. 16, 1996), for the

proposition that customer identities and other customer-related information cannot be trade

_____

[16] The plaintiff has submitted evidence that commercially available lead lists do not
identify the leads' current insurance company or their policy expiration dates.  (Docket No. 104
¶ 16.)

[17] The court's conclusion that the information at issue is economically valuable and is not
easily reproducible is bolstered by the fact that a number of courts in other jurisdictions,
applying similar statutes and common law, have found that insurance policyholder lists and
policy expiration dates can qualify as trade secrets.  *E.g.*, *Monona County Mut. Ins. Ass'n v.*
*Hoffman Agency, Inc.*, No. 0-640, 2010 Iowa App. LEXIS 1433, at \*18-19 (Iowa Ct. App. Nov.
24, 2010); *Nationwide Mut. Ins. Co. v. Santo Ins. & Fin. Serv., Inc.*, No. 2010-CV-155, 2010
N.H. Super. LEXIS 20, at \*15-19 (N.H. Super. Ct. Apr. 21, 2010); *Joe N. Pratt Ins. v. Doane*,
No. V-07-07, 2009 U.S. Dist. LEXIS 88314, at \*20-23 (S.D. Tex. Sept. 25, 2009); *Kovarik v.*
*Am. Family Ins. Group*, 108 F.3d 962, 966 (8th Cir. 1997) (applying North Dakota law); *Am.*
*Credit Indem. Co. v. Sacks*, 262 Cal. Rptr. 92, 97 (Cal. Ct. App. 1989); *1st Am. Sys.*, 311 N.W.2d
at 58; *see also Xerox Corp. v. O'Dowd*, No. 3:06-0434, 2006 U.S. Dist. LEXIS 78339, at \*26
(M.D. Tenn. Oct. 26, 2006) (applying New York law and stating that "[a] customer list
developed through substantial effort and kept in confidence may be treated as a trade secret . . .
so long as the information it contains is not otherwise readily ascertainable.").  The court
acknowledges, however, that contrary precedent also exists.  *E.g.*, *Harvest Life Ins. Co. v.*
*Getche*, 701 N.E.2d 871, 876 (Ind. Ct. App. 1998).

secrets "because the information is often available from sources other than the employer."[18] (Docket No. 395 at 24.)  But this blanket statement contradicts the more recent *Hamilton-Ryker* case, which strongly implies that, in certain circumstances, such information may constitute trade secrets.  2010 Tenn. App. LEXIS 55 at *37 ("[C]ustomer lists . . . and pricing information [is] protectable only to the extent that it satisfie[s] the definition of a trade secret." (quotation marks omitted)).

Moreover, the defendants' cases are distinguishable from this case.  *Amarr* dealt with the garage door wholesale industry.  There was testimony in that case that prices were public and that "it [was] common knowledge who is in the door business in the area" – i.e., who constituted the plaintiff's customer base – "because all advertise in the phone book."  *Amarr*, 1996 Tenn. App. LEXIS 660, at *6.  Similarly, in *Heyer-Jordan*, the plaintiff company was in the "manufacturer's sales representative" business.  801 S.W.2d at 815.  The court found that lists of buyers for a particular manufacturer's product were not confidential information because "[s]imilar lists . . . can be obtained from 'buyer's groups,'" and "information on manufacturers and buyers can be obtained through contacts at trade shows as well as information in trade magazines and even the yellow pages."  *Id.* at 819-20.  The key fact distinguishing the instant case is that the property and casualty insurance business has a very broad spectrum of possible

---

[18] The Campbell Defendants also cite *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602 (Tenn. Ct. App. 1998), for the rule that "[r]emembered information as to a business's prices" is not confidential.  *Id.* at 606.  This rule is inapplicable here, because American National's claim is based on information contained in customer files and declaration pages, not on information that the Campbells simply remembered.

customers.[19]  As discussed above, it appears that it would be practically impossible for a third party, starting from scratch, to compile a list of American National policyholders, their coverage and pricing details, and their policy expiration dates.[20]

The Campbell Defendants also point to *B&L Corp.*, 162 S.W.3d 189, which found that the plaintiff's "customer information, specifically, client names, prices charged for services rendered, customer contract renewal dates, and the identity of client representatives," did not constitute confidential information. *Id.* at 213.  Again, however, *B&L* involved a more targeted industry than the insurance industry – there, the plaintiff "provide[d] unemployment cost control systems and other professional services to business entities." *Id.* at 193 (quotation marks omitted).  The court's holding was based on the fact that, unlike the instant case, it was possible for the plaintiff's competitors to identify potential customers via the yellow pages or trade associations. *Id.* at 213-14.  Moreover, one member of *B&L*'s three-judge panel criticized the majority's "unpersuasive" reasoning because it implied that "no customer lists by any employer would be deemed confidential." *Id.* at 224 (Kirby, J., partially concurring).  Overall, the defendants have failed to show that, in the circumstances of this case, American National's customer information can be easily replicated.

Third, the plaintiff has submitted evidence that it takes measures to keep its purported

_____

[19] Furthermore, both *Heyer-Jordan* and *Amarr* arose in the context of non-compete contract claims rather than trade secrets tort claims, and both cases pre-date TUTSA.

[20] Montgomery cites a number of non-Tennessee cases involving industries in which the customer base was small enough that competitors could feasibly collect information from the customers themselves.  (Docket No. 400 at 17 n.13.)  For the same reason, those cases are inapposite.

trade secrets confidential. American National maintains its customer information on a secure computer system at its home office, and it grants access to employees on a need-to-know basis. In addition, the company's agent agreements contain a provision designating the information – specifically, "information regarding names [and] addresses . . . of policyholders; the description and location of insured property; and expiration or renewal dates (x-dates) of policies" – as "trade secrets," and it requires the agent to return such information upon termination of the agreement. As illustrated by this suit, American National enforces this provision with litigation.[21] This is enough for a reasonable juror to conclude that American National takes reasonable efforts to maintain secrecy.[22]

The defendants respond that American National "routinely discloses" its customer information to third parties. (Docket No. 395 at 21-22.) First, National Flood Services, a third-

---

[21] The defendants argue that this provision does not ensure secrecy because it does not specifically instruct the agent to keep the customer information "confidential." (Docket No. 395 at 29.) But the 2005 Agreement clearly designates the customer information as "trade secrets" and requires the agent's shareholders "to maintain in force any business which you place with the Company." After termination of the agreement, the shareholders and the agent are prohibited from directly or indirectly inducing an American National policyholder to switch insurance companies. It seems clear that providing "trade secret" information to American National's competitors constitutes, at a minimum, an indirect attempt to induce policyholders to switch to that competitor. Thus, at least through the end of the non-compete period, the agreement implicitly prohibits dissemination of the customer information to competitors.

[22] Previously, the court denied the plaintiff's motion for a preliminary injunction regarding its trade secrets claim. (Docket No. 99 at 17.) As the Campbell Defendants point out, the court found that the contractual trade secrets provision, standing alone, was not sufficient to show that the plaintiff made reasonable efforts to maintain secrecy. (*Id.* at 16-17.) This holding is irrelevant to the instant summary judgment motions, however. Previously, the plaintiff's burden was to show that it had a likelihood of success on the merits, whereas now, it merely needs to show the existence of genuine issues of fact. In addition, the plaintiff has since submitted additional evidence regarding its secrecy efforts.

party administrator for flood insurance policies, either receives or issues declaration pages for American National's flood policies.  But the defendants have not shown that National Flood Services further disseminates the information to competing insurance companies or the general public, nor does it appear that National Flood Services receives information regarding other types of insurance policies.[23]  Second, American National agents sometimes provide declaration pages upon request to third parties to verify the insured's coverage; for example, agents might provide coverage information to a bank during the refinancing of an insured house.  But these are isolated occurrences, and they do not necessarily show that American National fails to ensure that its *collection* of customer information remains secret.  Furthermore, nothing suggests that National Flood Insurance or banks are willing to further disseminate the customer information. *See Harsco Corp. v. Piontek*, 2008 U.S. Dist. LEXIS 17104, at *31-32 n.14 (M.D. Tenn. Mar. 5, 2008) ("'[A]bsolute secrecy is not required,'" as long as there is a "'substantial element of secrecy so that a third person would have difficulty in acquiring the necessary information . . . without resorting to the use of improper means of acquiring the secret.'" (quoting *Hickory Specialities v. B & L Labs.*, 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979)).

    The defendants also point out that, even after termination, American National's agents retain commission statements, which list the customer's name, the policy number, and the

---

[23] The defendants point out that, even after the termination of the 2005 Agreement, Campbell Insurance continued to receive copies of declaration pages regarding approximately 16 policies from National Flood Services.  (Docket No. 400 at 18.)  This was an oversight by American National and National Flood Services, which was promptly corrected once the plaintiff realized the mistake.  (*See* Docket No. 445 at 20.)  Although such mistakes are certainly relevant to the reasonableness of the plaintiff's efforts to maintain secrecy, they are not dispositive of the issue.

amount of premiums.  (Docket No. 395 at 23; Docket No. 400 at 19.)  But the defendants do not claim that these commission statements list expiration dates.  Moreover, even though agents retain these documents after termination, the agents are subject to a one-year non-compete provision.  This provision, which prohibits directly or indirectly inducing American National policyholders to cancel or change their policies, seems to prevent former agents from sharing such information with competitors for at least one year.  By that time, the customer and pricing information might be stale, and thus less useful.  Despite the defendants' arguments, the plaintiff has shown that a reasonable juror could find that American National takes reasonable steps to protect its customer information.

Finally, Montgomery argues that it did not knowingly misappropriate trade secrets, because the declaration pages at issue were not marked "confidential."  (Docket No. 400 at 20.) The most relevant definition for "misappropriation" contained in the TUTSA is "use of a trade secret . . . by a person who . . . knew or had reason to know that that person's knowledge of the trade secret was . . . [d]erived from . . . a person who owed a duty to the [plaintiff] to maintain its secrecy or limit its use."  Tenn. Code Ann. § 47-25-1702(2)(B)(ii)(c).  Montgomery knew that Tommy Campbell, the principal of a captive American National agency, was providing Montgomery with copies of American National declaration pages.  This is sufficient to raise a question of fact as to whether Montgomery knew, or had reason to know, that Campbell owed a duty to avoid giving such information to the plaintiff's competitors.

In sum, the plaintiff has sufficiently raised questions of fact as to whether the customer information at issue constituted trade secrets and whether the defendants engaged in

misappropriation.[24]  Accordingly, the plaintiff's trade secrets claims will remain for trial.

## D.    Intentional Interference with Business Relationships

Both the plaintiff and Montgomery seek summary judgment on the intentional interference with business relationships claim against Montgomery.  (Docket No. 400 at 21-22; Docket No. 407 at 15-20.)  Although the plaintiff alleges that Montgomery interfered with its relationships with its policyholders, Campbell Insurance, and Tommy Campbell (Docket No. 160 ¶¶ 122-49), the plaintiff's motion relates only to interference with policyholders.

To recover on an interference claim, a plaintiff must show:

> (1) an existing business relationship with specific third parties or a
> prospective relationship with an identifiable class of third persons;
> (2) the defendant's knowledge of that relationship and not a mere

---

[24] The defendants make much of two Wisconsin cases that found that American National's customer information did not constitute trade secrets.  *Am. Nat'l Prop. & Cas. Co. v. Graham*, No. 04-C-1185, 2007 U.S. Dist. LEXIS 17335 (E.D. Wis. Mar. 8, 2007); *Am. Nat'l Prop. & Cas. Co. v. Brass*, No. 2006AP1653, 2007 Wisc. App. LEXIS 730 (Wis. Ct. App. Aug. 22, 2007).  But these cases applied Wisconsin trade secrets law, which is more stringent than Tennessee law regarding customer lists.  Specifically, both cases cite *Corroon & Black-Rutters & Roberts, Inc. v. Hosch*, 325 N.W.2d 883 (Wis. 1982), which held that an insurance agent's "list of names, addresses, coverage amounts, and renewal dates" were not trade secrets.  *Graham*, 2007 U.S. Dist. LEXIS 17335, at *10; *see also Brass*, 2007 Wisc. App. LEXIS 730, at *7-8.  Because there is no similar Tennessee case law, the value of *Graham* and *Brass* as persuasive authority is limited.

The defendants also point out that, in *Brass*, the court addressed certain testimony by American National assistant vice president Pat Leeper, who served as a Rule 30(b)(6) witness in the instant case.  The *Brass* opinion stated that Leeper testified that American National "did not consider its insureds' names to be trade secrets" and conceded that "information regarding insureds' locations, coverages and other characteristics could be obtained from other sources, including the insureds themselves."  2007 Wisc. App. LEXIS 730 at *5.  Although this contradicts Leeper's current testimony and impacts his credibility, it does not *negate* his current testimony.  Moreover, *Brass* does not state that Leeper testified that expiration dates and pricing information were not trade secrets; he only mentioned "insureds' names."  Although the defendants have certainly raised issues of fact regarding the plaintiffs' trade secrets claim, this is not enough to merit summary judgment.

> awareness of the plaintiff's business dealings with others in
> general; (3) the defendant's intent to cause the breach or
> termination of the business relationship; (4) the defendant's
> *improper motive or improper means*; and finally, (5) damages
> resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (footnotes and

citation omitted).  The tort applies to "[i]nterference with the exercise by a third party of an

option to renew or extend a contract with the plaintiff."  *Id.* at 701 n.4 (quotation marks omitted).

"It is important to note that *either* 'improper motive' or 'improper means' will suffice."

*Watson's Carpet & Floor Covering, Inc. v. McCormick*, 247 S.W.3d 169, 176 (Tenn. Ct. App.

2007) (emphasis added).  In *Trau-Med*, the Tennessee Supreme Court explained:

> [A] determination of whether a defendant acted "improperly" or
> possessed an "improper" motive is dependent on the particular
> facts and circumstances of a given case, and as a result, a precise,
> all-encompassing definition of the term "improper" is neither
> possible nor helpful. . . .
>
> [W]e cite the following methods as some examples of improper
> interference: those means that are illegal or independently tortious,
> such as violations of statutes, regulations, or recognized
> common-law rules; . . . [and] those methods that violate an
> established standard of a trade or profession, or otherwise involve
> unethical conduct, such as sharp dealing, overreaching, or unfair
> competition.

*Trau-Med*, 71 S.W.3d at 701 n.5 (citations omitted).

Here, it is undisputed that American National had contractual relationships with its

policyholders and that Montgomery sought to terminate those relationships.  The jury will

determine whether Montgomery misappropriated trade secrets or induced Tommy Campbell to

breach his contract with American National; if so, both actions constitute improper means, and

the plaintiff may recover on its interference claim. If Montgomery's actions were not independently tortious, however, a reasonable juror could find that Montgomery did not employ improper means.[25]

Because there are issues of fact regarding whether Montgomery employed improper means, the plaintiff's interference claim will remain for trial.[26]

### E.  Unfair Competition

Next, Montgomery's motion addresses the plaintiff's unfair competition claim. (Docket No. 400 at 22). In Tennessee, "'Unfair Competition is a generic name for several related torts involving improper interference with business prospects.'" *B&L Corp.*, 162 S.W.3d at 215 (quoting *B&L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 681 (Tenn. Ct. App. 1995)). "[U]nfair competition . . . can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects." *Id.* at 216 (quoting Prosser and Keeton on Torts § 130 (5th ed. 1984)). Montgomery's only

---

[25] The plaintiff argues that Montgomery undisputedly employed improper means because it violated trade standards. (Docket No. 407 at 16-19.) First, it cites deposition testimony that Montgomery does not interfere with the "expirations," or the "exclusive right to solicit renewals and retain the insured's policy files," on its own agents' insurance policies. (*Id.* at 17.) Second, it cites testimony that Montgomery generally does not disclose its own policy expiration dates or pricing information to outside parties. (*Id.* at 18.) But Montgomery's treatment of *its own* data is irrelevant to trade standards regarding how insurers handle *competitors'* data. At best, factual issues remain regarding whether Montgomery violated trade standards.

[26] Montgomery's argument regarding the interference claim is brief and unclear. The defendant apparently contends that the interference tort applies only to prospective business relationships that are not governed by a formal contract. (Docket No. 400 at 22.) If so, this is a plain misreading of *Trau-Med*. The defendant also states that the interference claim should fail for the same reasons as the procurement of breach of contract claim (*id.* at 22), but, as discussed above, the court is not dismissing the plaintiff's procurement claim.

argument for dismissal of the unfair competition claim is that it is duplicative of the plaintiff's other claims. This is not a sufficient basis for dismissal, however, and the plaintiff's unfair competition claim will remain for trial.

### F.      Civil Conspiracy

Finally, Montgomery argues that the plaintiff's civil conspiracy claim should be dismissed because the underlying claims against Montgomery are meritless. (Docket No. 400 at 23.) It is true that "[c]ivil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's*, 247 S.W.3d at 186. The court has found, however, that several of the plaintiff's tort claims against Montgomery and the Campbell Defendants may go forward. Thus, the civil conspiracy claim cannot be dismissed on that basis and will remain for trial.

### III.     Motions Related to the Claims Against the Campbell Defendants

The plaintiff and the Campbell Defendants have filed cross-motions for summary judgment regarding the claims against the Campbell Defendants. Again, the court will address each claim in turn.

### A.      Breach of 2005 Agreement

The plaintiff argues that summary judgment is appropriate on its breach of contract claims because Campbell Insurance and the Campbells have each breached the 2005 Agreement. In their own motion, the Campbell Defendants argue that the claim against the Campbells should be dismissed because the contract is inapplicable.

The 2005 Agreement's choice-of-law provision calls for the application of Missouri law

32

(Docket No. 279, Ex. 6 at 5), and all parties agree that Missouri law governs the plaintiff's contract claims. Under Missouri law, the elements of a breach of contract claim are: "(1) a contract between the plaintiff and the defendant; (2) rights of the plaintiff and obligations of the defendant under the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Teets v. Am. Family Mut. Ins. Co.*, 272 S.W.3d 455, 461 (Mo. Ct. App. 2008).

### 1.    Existence of Contract and Breach

As to the first element, the undisputed evidence shows that a valid contract existed between the plaintiff, on the one hand, and Campbell Insurance and the Campbells, on the other.[27] The Campbell Defendants argue that Tommy and Colleen Campbell, as individuals, were not parties to the 2005 Agreement. (Docket No. 395 at 31-33.) In support, they point out that the agreement stated that American National "hereby contracts with and appoints the Agent" and that "Agent" was defined as Campbell Insurance. (Docket No. 279, Ex. 6 at 1.) But the agreement also: (1) contained many provisions regarding "you" and "your" responsibilities and limitations; (2) defined the terms "you" and "your" as "Agent's Stockholder(s)"; (3) listed

_____

[27] The Campbell Defendants make the frivolous argument that the 2005 Agreement is invalid because it was unconscionable. (Docket No. 429 at 12-15.) "An agreement is unconscionable if it involves an inequality so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *Landers v. Sgouros*, 224 S.W.3d 651, 664 n.12 (Mo. Ct. App. 2007) (quotation marks omitted); *see also Smith v. Kriska*, 113 S.W.3d 293, 298 (Mo. Ct. App. 2003) (defining an unconscionable contract as "one such as no man in his senses and not under delusion would make, on the one hand, and as no honest and fair man would accept on the other" (quotation marks omitted)). It is obvious that the 2005 Agreement, which merely limited the Campbell Defendants' ability to compete against the plaintiff during their relationship and for one year after termination, does not rise to this level.

Tommy and Colleen Campbell as stockholders; and (4) was signed by both Tommy and Colleen Campbell. In other words, the Campbells signed an agreement that expressly governed their individual conduct. Moreover, Tommy Campbell admitted at his deposition that he was under contract with American National. (Docket No. 269, Ex. 2 at 522 (admitting that he had a contract with American National and that he told a third party "that [he] was contracted with American National."). This is enough to show that the 2005 Agreement bound the Campbells as individuals.

As to the second and third elements, it is clear that Tommy Campbell breached at least *some* of his obligations under the 2005 Agreement, although there are factual issues regarding the extent of the breaches. Specifically, in a section titled "Your Responsibilities," the 2005 Agreement stated that "[y]ou agree to use your best efforts . . . to maintain in force any business which you place with the Company" and that "[y]ou will use your best efforts . . . to actively represent the Company's best interests." (Docket No. 279, Ex. 6 at 3.) These provisions applied to Tommy Campbell, and the undisputed evidence shows that, at a minimum, Campbell: (1) was involved in purchasing and installing a computer system for A 2 Z (Docket No. 430 ¶¶ 112-14); (2) transferred some American National policyholder information to that computer system (*id.* ¶ 115); (3) permitted Campbell Insurance to pay the wages of employees who were selling insurance on behalf of A 2 Z (*id.* ¶¶ 120, 125); and (4) shared office space with A 2 Z, which was actively competing with American National (*id.* ¶¶ 103-07). These actions constitute a breach of Tommy Campbell's obligations to use his best efforts to maintain in force American National's policies and to actively represent American National's best interests.

Furthermore, it appears that Campbell Insurance violated the non-compete provisions in the 2005 Agreement. For one year after termination, the agreement prohibited the "Agent" from "directly, or indirectly through any partner, Agent, employee, or firm on the Agent's behalf, solicit[ing] or accept[ing] any property or casualty insurance from any policyholder of the company whose business they wrote . . . while a representative of the Company." (*Id.* at 7.) It is undisputed that, for at least three weeks after the termination of the 2005 Agreement, Campbell Insurance paid the wages of employees who were selling policies on behalf of A 2 Z and paid A 2 Z's rent. (Docket No. 430 ¶¶ 104, 120; Docket No. 402, Ex. 2 at 269-70.) This likely violated the non-compete provision.[28]

The plaintiff also argues that Campbell Insurance and Tommy Campbell violated a number of provisions contained in the "Limitations on Authority" section.[29] That section stated, in relevant part:

> In general, you are denied all power or authority not specifically granted, including, but not limited to, the following: . . .

---

[28] For the same reason, Tommy Campbell, who approved Campbell Insurance's payments, violated the non-compete provision applicable to him.

The plaintiff argues that Campbell Insurance and Tommy Campbell further violated the non-compete provisions by soliciting policyholders after June 2008. The defendants dispute this, however, and they have submitted evidence that almost all of the converted policyholders signed a document titled "No Solicitation Understanding," which stated, in relevant part, that the policyholder "acknowledges that he or she has not been induced, either directly or indirectly, by Tommy Lynn Campbell or through any partner, agent, employer or firm on behalf of Tommy Lynn Campbell, to lapse, cancel or replace any insurance policy of [American National]." (*E.g.*, Docket No. 281, Ex. 3 at 9.) This creates an issue of fact as to the extent of Campbell Insurance and Tommy Campbell's involvement in solicitation.

[29] In addition, the plaintiff argues that Campbell Insurance and Tommy Campbell violated the contract by failing to return certain business information.

b) Either directly or indirectly write or service by or through any solicitor, partner, Agent, firms . . . insurance for any other property and casualty company . . .

c) Induce or influence any policyholder to lapse, cancel, or replace any insurance policy of the Company. . . .

k) Participate in joint office arrangements with Agents or representatives of other insurance companies. This would include sharing office space . . . .

(Docket No. 279, Ex. 6 at 4-5.) At the very least, Tommy Campbell violated the provision regarding office sharing.[30]

The Campbell Defendants argue that the clauses contained in the "Limitation on Authority" section did not constitute affirmative prohibitions on Tommy Campbell's conduct; instead, they argue that the clauses merely limited Campbell's authority to bind American National while acting as its agent. Thus, the defendants argue, "[t]here is no express agreement between the parties that Campbell Insurance, Inc. [or Tommy Campbell] will refrain from performing these activities as a part of [their] contractual obligations, and the failure to abide by the terms of that section does not constitute a breach of contract. (Docket No. 429 at 15-18.)

Under Missouri law, however, a court "[must] not construe a contractual provision so as to render it meaningless; rather, [it must] favor an interpretation that gives each provision function and sense." *Hughes v. Davidson-Hues*, 330 S.W.3d 114, 120 (Mo. Ct. App. 2010). The relevant provisions in the "Limitation on Authority" section make sense only if they are interpreted as prohibiting conduct. For example, the agreement "denies" Campbell "all power"

---

[30] Because these provisions limit the conduct of "you," rather than the conduct of "Agent," however, they do not appear to apply to Campbell Insurance itself.

to "directly or indirectly write . . . insurance" for American National's competitors. That clause is meaningless and redundant unless it prohibits those actions. Under the defendants' interpretation, that clause would merely mean that Campbell lacked authority to bind American National while writing competitors' policies. But, by definition, an agent is not acting on American National's behalf when he is acting on its competitors' behalf; the defendants' interpretation would render the clause redundant and meaningless. Similarly, an agent who shares office space is not seeking to bind American National in any way, so the defendants' proffered interpretation of that clause renders it redundant and meaningless.[31] These provisions must instead be interpreted as affirmatively prohibiting the conduct that they discuss.[32]

Finally, however, the plaintiff has not shown that Colleen Campbell breached any obligation under the 2005 Agreement. By late 2007, Colleen Campbell owned no shares of Campbell Insurance. The relevant provisions and prohibitions in the 2005 Agreement – including the non-compete provision – speak in terms of "you" and "your," which are defined as referring to Campbell Insurance's stockholders. The only reasonable interpretation of these provisions is that they apply to Campbell Insurance's *current* stockholders. Any other interpretation would be absurd; for example, if the provisions continued to apply to former stockholders who have previously divested their shares, it is possible that those former

_____

[31] Other provisions from the "Limitation on Authority" section only make sense if interpreted as prohibitions on Campbell's conduct. For example, one clause prevents Campbell from "[p]erpetrat[ing] any fraud against [American National]." (Docket No. 279, Ex. 6 at 5.)

[32] In any event, the conduct discussed in these clauses is also prohibited by the more general clauses requiring Campbell to use his best efforts "to maintain in force any business which you place with the Company" and "to actively represent the Company's best interests." (Docket No. 279, Ex. 6 at 3.)

stockholders would be limited in their ability to compete against American National for years, or even decades, after the divestment. This is a result that the parties could not have intended.[33] See *Rathbun v. Cato Corp.*, 93 S.W.3d 771, 781 (Mo. Ct. App. 2002) ("Where a contract is fairly susceptible of two constructions, . . . the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair or improbable contract," and the court should avoid any interpretation that "produces a[n] . . . absurd, and therefore unreasonable result." (quotation marks omitted)); *Wildflower Community Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 536 (Mo. Ct. App. 2000) ("When interpreting contracts, this court 'attempts to avoid absurd results.'"). Here, Colleen Campbell transferred her interest in the company to her husband in 2007, before she began competing against American National. After that point, the 2005 Agreement no longer limited her conduct. Accordingly, the breach of contract claim against Colleen Campbell will be dismissed.

## 2. Damages

Although the plaintiff has shown that Tommy Campbell has undisputedly violated the 2005 Agreement and that Campbell Insurance likely violated the agreement, issues of fact regarding damages preclude summary judgment in the plaintiff's favor.

The plaintiff must show that damages resulted from the defendants' breaches. *Catroppa*

---

[33] Although this would seem to create a loophole allowing Tommy and Colleen Campbell to sell or transfer all of their shares in Campbell Insurance and then immediately compete against American National, the 2005 Agreement foreclosed that possibility. The agreement provided that it would automatically terminate in the event that the Campbells, collectively, owned less than 50 percent of the agency's stock. (Docket No. 279, Ex. 6 at 1.) Thus, if *both* Campbells divested their shares, the agreement would terminate and the non-compete provision would apply to the divesting stockholders.

*v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817 (Mo. Ct. App. 2008).  Under Missouri law, a

plaintiff may recover three kinds of damages: actual, consequential, and benefit-of-the-bargain.[34]

*Id.* at 818.  In *Catroppa*, the court explained:

> Actual damages are compensatory and are measured by the loss or
> injury sustained as a direct result of the wrongful act.
> Consequential damages are those damages naturally and
> proximately caused by the commission of the breach and those
> damages that reasonably could have been contemplated by the
> defendant at the time of the parties' agreement.  Finally,
> benefit-of-the-bargain damages, also called lost profits damages,
> are the net profits a plaintiff would have realized had the contract
> not been breached.

*Id.* (citations and quotation marks omitted).  Thus, the plaintiff must show the existence of

damages and a causal relationship between the defendants' breach and the damages.

### a.      Liquidated Damages

As an initial matter, the plaintiff maintains that the 2005 Agreement contains a liquidated

damages clause, making a calculation of lost profits unnecessary for its breach of contract

claims.  (Docket No. 403 at 12-16.)

The "Policy Rollover" section of the 2005 Agreement prohibited Campbell Insurance

from soliciting business from the agency's previous American National customers for one year

after termination of the agreement.  The section further provided:

> E.      INJURY
>
> 1.      Both parties agree that irreparable and incalculable injury
>         may be done to the Company by violation of this

---

[34] These measures of damages are "not necessarily inconsistent with one another," and,
"if the damages for all of those claims are the same, the damages award merges." *Catroppa*, 267
S.W.3d at 817-18 (quotation marks omitted).

> Agreement. Therefore, in the event of breach of this policy rollover provision by the Agent, it is agreed that the Company may compel compliance by injunction or other remedy, including but not limited to money damages.
>
> 2.   *Agent shall be obligated to reimburse the Company for premium losses* and for reasonable legal costs, fees, and expenses incurred by the Company in enforcing this Agreement.

(Docket No. 279, Ex. 6 at 7 (emphasis added).)  Notably, the agreement did not label this clause as a liquidated damages provision.

The plaintiff argues that the clause "Agent shall be obligated to reimburse the Company for premium losses" is a liquidated damages provision that provides a "simple formula" for calculating damages.  (Docket No. 403 at 12.)  It interprets the phrase "premium losses" to require Campbell Insurance to pay an amount equal to the premiums of policyholders that American National lost as a result of the agency's breach of the non-compete, calculated through the end of the non-compete period.  The plaintiff calculates the amount due under this provision to be approximately $940,850, which represents premium losses through June 10, 2009, one year after the 2005 Agreement was terminated.  (*Id.* at 16.)  Obviously, this is greater than the $395,000 of lost profits calculated by the plaintiff's damages expert.  In response, the Campbell Defendants argue that the parties never intended the clause to provide liquidated damages.

First, the court notes that the purported liquid damages clause does not instruct the court or the parties exactly how "premium losses" are to be calculated.  The plaintiff apparently assumes that recoverable "premium losses" extend only through the end of the non-compete period, but nothing in the language of the clause creates such a limitation.  Instead, the most

reasonable construction of the clause is that it simply requires the parties to substitute lost premiums in place of lost profits when calculating damages related to customers who were solicited in violation of the non-compete. Thus, the damages period is not necessarily limited to the end of the non-compete period; policyholders often renew their policies year after year, so it is likely that American National would have continued to receive premiums from some of the converted policyholders for many years, absent the alleged breach of the non-compete. Indeed, this assumption underlies the lost profits calculation by the plaintiff's damages expert, who calculated lost profits through 2014. The plaintiff fails to explain why the damages period for its lost profits calculation differs from the damages period for its lost premiums calculation.[35]

Second, the clause is an unenforceable penalty clause. Under Missouri law, "[t]he general rule is liquidated damages clauses are valid and enforceable, while penalty clauses are invalid." *Valentine's, Inc. v. Ngo*, 251 S.W.3d 352, 354 (Mo. App. Ct. 2008). Liquidated

---

[35] To the extent that the clause is ambiguous regarding its application, extrinsic evidence shows that the parties never intended for the clause to affect damages calculations in a breach of contract suit.

If an ambiguity exists, the court may consider extrinsic evidence to determine and give effect to the parties' intent. *Teets*, 272 S.W.3d at 462; *Boyer v. Sinclair & Rush, Inc.*, 67 S.W.3d 627, 631 (Mo. Ct. App. 2002). Pat Leeper, the plaintiff's Rule 30(b)(6) witness, testified that, in previous cases against former agents with similar agreements, American National never attempted to recover lost premiums under the purported liquidated damages provision. (Docket No. 395, Ex. 5 at 115-16.) This is remarkable, given that lost premiums are, by definition, larger than lost profits. Moreover, in the instant case, the plaintiff initially retained a damages expert to calculate lost profits. The first suggestion that the plaintiff would pursue a liquidated damages theory came in a supplemental discovery response on November 5, 2010, nearly two and one-half years after the filing of the suit.

These facts strongly support the defendants' contention that neither American National nor Campbell Insurance contemplated, at the time of contracting, that the 2005 Agreement contained a liquidated damages clause. Rather, they suggest that the plaintiff only recently began interpreting the clause as prescribing liquidated damages.

damages clauses provide "a measure of compensation which, at the time of contracting, the parties agree shall represent damages in case of breach," whereas penalty clauses provide "a punishment for breach." *Id.* A clause is enforceable as a liquidated damages provision if (1) it "represents a reasonable forecast of harm caused by a breach of contract," and (2) "the harm is of the type that is difficult to accurately estimate." *Mihlfeld & Assocs. v. Bishop & Bishop, L.L.C.*, 295 S.W.3d 163, 172 (Mo. Ct. App. 2009).

Damages related to business lost from converted policyholders are, to some degree, inherently speculative. To properly calculate such damages, the factfinder must know: (1) the amount of premiums on the relevant policies; (2) the insurance company's profit margin on the relevant policies, and (3) how many years into the future the policyholders would have renewed their policies. The latter two figures are generally difficult to accurately estimate.

Although the "premium losses" clause obviates the need to calculate profit margin, it does nothing to ease the difficulty of divining how many times the converted policyholders would have renewed their American National policies. More important, because the clause simply requires that the damages award consist of lost premiums instead of lost profits, it does not represent a reasonable forecast of the harm caused to the plaintiff. Effectively, the clause mandates that the factfinder use a profit margin of 100 percent. The plaintiff has submitted no evidence that this is, or ever was, a reasonable forecast of American National's profit margin when hundreds of converted policies are at issue. This is highlighted by the fact that the plaintiff's own damages expert has estimated that the applicable profit margin is 8.1 percent, and the defendants have submitted evidence that the proper figure is even lower. When a company's

profit margin percentage is in the single digits, 100 percent is not a reasonable forecast of that margin.

The unreasonableness of the forecast is evident when comparing the plaintiff's lost premiums calculations to its lost profits calculations for the same time period. *See Taos Constr. Co. v. Penzel Constr. Co.*, 750 S.W.2d 522, 527 (Mo. Ct. App. 1988) ("Although the Restatement speaks in terms of a 'reasonable forecast of just compensation,' actual damages are relevant to a determination of reasonableness."). Through the end of the non-compete period, the plaintiff seeks to recover $940,850 in lost premiums. The plaintiff's claimed lost profits for that same time period are less than $77,000. (Docket No. 395, Ex. 6 at 127-28 (deposition of the damages expert).) This huge discrepancy holds true for every possible damages period, of course; mathematically, the plaintiff's claimed lost premiums will always be 8.1 percent of its claimed lost profits. For example, the plaintiff seeks lost profits of $395,000 through 2014; for that same time period, the plaintiff's lost premiums exceed $4.87 million.[36]

This disproportionality shows that the "premium losses" clause could not possibly have been a reasonable estimate of potential harm. Accordingly, the clause is not an enforceable liquidated damages provision. In addition, Missouri law provides that, "[i]f the amount . . . stipulated as liquidated damages for breach of contract is greatly disproportionate to the ensuing loss, the court will construe it as a penalty and restrict the damages recovered to those actually suffered."[37] *Hawkins v. Foster*, 897 S.W.2d 80, 85 (Mo. Ct. App. 1995); *Norman v. Durham*,

---

[36] $395,000 is approximately 8.1 percent of $4.87 million.

[37] Missouri case law also provides that "the amount fixed [for liquidated damages] is reasonable to the extent that it approximates the loss anticipated at the time of the making of the

380 S.W.2d 296, 302 (Mo. 1964); *Plymouth Sec. Co. v. Johnson*, 335 S.W.2d 142, 152 (Mo. 1960); *see also Intertherm, Inc. v. Structural Systems, Inc.*, 504 S.W.2d 64, 66 (Mo. 1974) ("[T]he damages provided in the lease [were] not disproportionate to actual damages established. Such being so, the agreed amount is not to be considered oppressive and unenforceable, and may be accepted as agreed 'liquidated' damages." (citation and quotation marks omitted) (second alteration in original)).   Here, there is no question that the amount of lost premiums are greatly disproportionate to the amount of lost profits, making the purported liquidated damages clause invalid as applied to this case.

The plaintiff cites two Eighth Circuit cases, but neither case supports a finding that the instant clause is enforceable, because neither case involved a clause that simply substituted revenues for profits.  In *Overholt Crop Insurance Service Co. v. Travis*, 941 F.2d 1361 (8th Cir. 1991), the defendant insurance representative violated a non-solicitation clause in his employment agreement.  *Id.* at 1364.  The relevant clause provided for liquidated damages "totaling twice the annual . . . premiums lost as a result of [the defendant's] contractual violation."  *Id.* at 1369-70.  The court, applying South Dakota law, held that this was enforceable, because it "reasonably estimate[d] what are difficultly calculated future damages."  *Id.* at 1370.  The court explained that, "[w]ith a historic renewal rate of approximately ninety percent, the loss of one customer potentially has a recurring impact, particularly when the loss of

---

contract, even though it may not approximate the actual loss."  *Paragon Group v. Ampleman*, 878 S.W.2d 878, 881 (Mo. Ct. App. 1994) (quoting Restatement (Second) of Contracts § 356 cmt. b).  But this does not conflict with the rule stated in *Hawkins*; a liquidated damages amount that merely fails to approximate the actual loss is not necessarily "greatly disproportionate" to the actual loss.

44

referrals is also considered." *Id.*

Here, of course, there exists the same difficulty regarding renewal rates, and the "premium losses" clause does nothing to address the problem. Unlike the liquidated damages clause in *Overholt*, the instant clause does not limit the plaintiff's recovery to a certain multiple of the policyholders' annual premiums. This is a key distinction, because it greatly reduces the clause's usefulness and accuracy.

Similarly, the plaintiff cites *Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893 (8th Cir. 2010), in which a stockholder agreement specified that, upon a breach of certain restrictive covenants, the stockholder would pay an amount equal to the plaintiff's gross billings for a two-year period. 614 F.3d at 910. The Eighth Circuit, applying Missouri law, noted that there was "no authority to support [the defendants'] position that the liquidated damages measure is unreasonable unless it is measured by . . . net profits."[38] *Id.* at 911. Again, however, the clause in *Mayer Hoffman* specified a two-year period, whereas the instant clause does not. Furthermore, that court found it relevant that the clause at issue was titled "Liquidated Damages," *id.* at 910 n.25, unlike the instant clause.

Because the "premium losses" clause contained in the 2005 Agreement does not provide a reasonable estimate of American National's potential damages, it is not an enforceable liquidated damages provision. Accordingly, to recover on its breach of contract claims, the plaintiff must prove the actual damages cause by the defendants' breaches.

---

[38] Notably, however, the *Mayer Hoffman* court did not cite any directly on-point Missouri cases for the proposition that a liquidated damages clause awarding gross revenues, as opposed to profits, is enforceable.

## b.    Existence of Actual Damages

In addition to disputing the applicability of liquidated damages, the Campbell Defendants argue that their breaches did not result in any actual damages.  (Docket No. 429 at 31-32, 35-38.)

As mentioned, the plaintiff's damages expert calculated that the loss of the converted policyholders resulted in lost profits of approximately $395,000 for 2008 through 2014.[39] (Docket No. 371 at 1.)  These calculations accounted for the premiums the policyholders had been paying to American National, the average annual increase in premiums, the average policyholder renewal rate, and American National's profit margin.  The expert used a profit margin of 8.1 percent, which was based on the company's financial statements for 2005 through 2007.

The Campbell Defendants attack this damages figure in several ways.  First, they argue that the converted policyholders would have left American National, regardless of the defendants' actions.  The defendants have previously submitted sworn statements from 55 converted policyholders, each stating that the customer was somehow dissatisfied with American National's high premiums.  (Docket No. 281, Exs. 3-4.)  Second, the Campbell Defendants argue that the proper profit margin figure is 0 percent, because American National failed to turn a profit in 2008 and 2009.  Third, as mentioned earlier, American National has stated that its premiums collected from the converted policyholders in 2008 and 2009 would have totaled $940,850.  The defendants have submitted evidence that the actual insurance claims submitted by those policyholders and paid out by their insurance companies (and related expense) during

---

[39] The court assumes that, at trial, the plaintiff will present evidence justifying this six-year damages period.

that time period totaled $883,377 and that American National would have paid sales commissions of approximately 10 percent, or $90,000. Together, the defendants argue, this totals $973,377; because this exceeds the $940,850 in lost premiums, they claim, the plaintiff would have actually lost money on the converted policyholders.

The defendants' evidence is enough to create issues of fact regarding the plaintiff's damages, both as to the existence of and the proper measure of damages. In addition, the jury will need to determine which contractual breaches, if any, caused American National to lose customers. These factual issues preclude summary judgment in the plaintiff's favor on its contract claims against Tommy Campbell and Campbell Insurance.

### c.       Offsetting Benefits

Finally, the Campbell Defendants maintain that any eventual recovery by the plaintiff should be reduced by (1) the amount of post-termination compensation that Tommy Campbell would have received absent his contractual breaches[40] and (2) the amount of commissions saved by American National by transferring policies from Campbell Insurance to lower-commission

---

[40] Tommy Campbell's 1997 Agreement provided that, if he met certain eligibility requirements, he would receive post-termination compensation benefits. The parties dispute the precise value of these benefits; the plaintiff estimates that their present value is approximately $137,000, while the defendant claims $265,400. The 1997 Agreement stated that Campbell would forfeit this compensation if he "violated any of the provisions of this Agreement or acted to prejudice materially the interests of the Company at, before, or after termination of this Agreement." (Docket No. 279, Ex. 1 at 6.) Although the 2005 Agreement superseded the 1997 Agreement, the 2005 Agreement provided that it "shall not impair your right to monies, if any, earned under a prior Agreement or Agreements with the Company." (*Id.*, Ex. 6 at 8.)

Campbell previously brought a counterclaim against the plaintiff, seeking payment of the post-termination compensation, but the court dismissed it, finding that Campbell had breached the 1997 Agreement and forfeited the compensation. (Docket No. 308 at 8-11.) The same conduct by Campbell that constituted a breach of the 2005 Agreement also constituted a breach of identical provisions in the 1997 Agreement.

agents. (Docket No. 429 at 33-35.) The plaintiff argues that any offset would be inappropriate because it would effectively allow Campbell to circumvent the court's ruling that he is not entitled to his post-termination compensation. (Docket No. 403 at 30.) The plaintiff also disputes that it actually saved any money on commissions. (*Id.* at 31.)

The reduction sought by the defendants is a relatively straightforward application of the offsetting-benefits rule. As stated in the Restatement, a plaintiff can recover damages on a contract claim equaling the losses caused by the breach, minus "any cost or other loss that he has avoided by not having to perform." Restatement (Second) of Contracts § 347(c) (1981). The comments to that section explain: "Sometimes the breach itself results in a saving of some cost that the injured party would have incurred if he had had to perform. . . . Loss avoided is subtracted only if the saving results from the injured party not having to perform rather than from some unrelated event." *Id.* cmt. d. Similarly, the Restatement (Second) of Torts provides that, "[w]hen the defendant's tortious conduct has . . . conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable." Restatement (Second) of Torts § 920 (1977); *see also Nesselrode v. Exec. Beechcraft, Inc.*, 707 S.W.2d 371, 386 (Mo. 1986) (noting "the fundamental proposition that the purpose of awarding compensatory damages in a civil tort action is to . . . place [the plaintiff] in a position as near the one he would have occupied had he not been injured as a result of defendant's tortious conduct").

The Restatement (Second) of Contracts gives the following classic illustration of the rule, as it relates to contract claims:

> A contracts to build a house for B for $100,000. When it is partly
> built, B repudiates the contract and A stops work. A would have to
> spend $60,000 more to finish the house. The $60,000 cost avoided
> by A as a result of not having to finish the house is subtracted from
> the $100,000 price lost in determining A's damages. A has a right
> to $40,000 in damages from B, less any progress payments that he
> has already received.

Restatement (Second) of Contracts § 347 cmt. d, illus. 5.

Put another way, "anything of value that the plaintiff retains because of the breach, but that was to have been delivered to the defendant had the contract been performed, must be deducted from the plaintiff's gross recovery." 22 Am. Jur. 2d *Damages* § 385; *see also id.* § 384 ("[A] benefit conferred by the tortfeasor is weighed against the elements of claimed damage."). The Campbell Defendants cite two cases, *Louisiana Sulphur Carriers, Inc. v. Gulf Resources & Chemical Corp.*, 53 F.R.D. 458 (D. Del. 1971), and *Macon-Bibb County Water & Sewerage Authority v. Tuttle/White Constructors, Inc.*, 530 F. Supp. 1048 (M.D. Ga. 1981), recognizing this rule. The court in *Louisiana Sulphur* summarized:

> Where the defendant's wrong or breach of contract has not only
> caused damage, but has also conferred a benefit upon the plaintiff
> (such as saving of expense of performance or making available an
> opportunity to dispose of goods or services) which he would not
> otherwise have reaped, the value of this benefit must be credited to
> defendant in assessing the damages.

53 F.R.D. at 461 (quoting *McCormick on Damages* § 40 (1935)).

The plaintiff argues that the offsetting benefits doctrine does not apply because "American National has <u>fully performed</u> [its] obligation" under the post-termination compensation clause and "paid Mr. Campbell <u>exactly</u> the amount he specifically agreed to receive under the circumstances" – that is, nothing. (Docket No. 403 at 27.) The plaintiff cites

49

*Ford v. American Express Financial Advisors, Inc.*, 98 P.3d 15 (Utah 2004), for the proposition that the doctrine does not apply when a plaintiff has fully performed under the relevant contract.

The plaintiff errs, however, by not considering its contractual obligations as they existed immediately *before* Campbell breached the 2005 Agreement. Before Campbell's breach, American National had not fully performed under the contract; instead, it was still obligated to pay Campbell a significant amount of post-termination compensation. The only reason that American National is no longer required to make those payments is because Campbell breached the agreement. Thus, the plaintiff was excused from performing under the contract – i.e., from paying Campbell his post-termination compensation – as a direct result of Campbell's breach, and the same conduct that damaged the plaintiff also benefited the plaintiff. This is entirely analogous to a plaintiff that is excused from performing because the defendant has repudiated the contract; in both instances, the plaintiff is able to retain certain benefits as a direct result of the breach. It is immaterial whether the retention occurs because the breach constituted a repudiation or because the breach triggered certain terms in the contract.

*Ford* is inapposite. In that case, the plaintiffs were financial planners who worked for the defendant as independent contractors. *Ford*, 98 P.3d at 18. Their relationship was governed by a contract providing that, if the plaintiffs met certain production levels, the defendant would contribute money to their insurance coverage during the next fiscal year. *Id.* The defendant terminated the contract, replacing it with a new contract, and refused to pay the plaintiffs their previously earned insurance contributions. *Id.* The defendant argued that its decision to discontinue the insurance contributions allowed it to pay higher cash commissions to the

plaintiffs under the new contract.  *Id.* at 24.  It sought to offset this increase in commissions against the damages attributable to the unpaid contributions.  *Id.*

The Utah Supreme Court recognized that the "primary concern of . . . the cases that have applied the offset theory is an equitable one: to avoid putting the plaintiff in a better position than he would have occupied but for the breach."  *Id.* at 26.  The court noted that the rule has traditionally been applied in only two situations: (1) where "'the means necessary for the plaintiff to have obtained the profit or savings from [a] subsequent contract would have been unavailable if the original contract had been performed,'" and (2) where the breach "'resulted in a direct and immediate savings to the plaintiff, i.e., savings on the cost of performance.'"  *Id.* at 25 (quoting *Macon-Bibb*, 530 F. Supp. at 1055).  The court reasoned that, because the plaintiffs had already completely performed their obligations under the original contract by the time of the defendant's breach, the plaintiffs could not possibly have saved money by avoiding performance or by making a subsequent contract with a different party.  *Id.* at 26-27.  Because the defendant's breach did not allow the plaintiffs to retain any particular amount of money, the court refused to apply the offsetting benefits doctrine.  *Id.* at 27.

The situation here is different.  As discussed above, American National had not completely performed under the relevant agreement before Campbell committed his breach.  If American National is allowed to recover lost profits attributable to that breach, while simultaneously retaining the post-termination benefits that it otherwise would have paid out, it would be placed in a better position than it was in before Campbell's breach.  This is inequitable. Furthermore, contrary to the plaintiff's argument, an offset does not allow Tommy Campbell to

circumvent the dismissal of his counterclaim, which sought recovery of the post-termination benefits. Allowing a defendant to offset a plaintiff's damages award by a certain amount is markedly different from awarding a defendant his own damages; in the former situation, the defendant does not secure a judgment against the plaintiff, and the plaintiff is not forced to pay money to the defendant.

Accordingly, the defendants may introduce evidence at trial regarding savings that directly resulted from their breaches or wrongdoing. Such amounts are properly offset against any eventual recovery by the plaintiff.

## B.    Guaranty Agreement

Next, the Campbell Defendants argue that Tommy and Colleen Campbell are not individually liable for any eventual recovery against Campbell Insurance, because the guaranty that they signed is invalid.

The Campbells executed a "Unanimous Consent of Stockholders" contemporaneously with the 2005 Agreement. That document (the "Guaranty") provided, in relevant part:

> We, the undersigned, being all of the Stockholders of Campbell Insurance, Inc. (the corporation), . . . consent to the following . . . :
>
> 1. <u>GUARANTY</u>, for the value received, and to induce [American National] to enter into the attached Corporate Agent Agreement, each and every Stockholder, jointly and severally hereby guarantees the liabilities and obligations of the Corporation to Company as set forth in the attached Corporate Agent Agreement.

(Docket No. 279, Ex. 6 at 2.) The Guaranty is signed by both Tommy and Colleen Campbell.

The defendants argue that the Guaranty is invalid because "it is patently unclear in what capacity [the Campbells] have signed the document" – namely, whether they signed as

52

individuals or as officers on behalf of Campbell Insurance. (Docket No. 395 at 34-36.) The court finds it is exceedingly clear, however, that the Campbells signed the document in an individual capacity. Indeed, any other interpretation of the Guaranty would be nonsensical; "a guaranty contract signed individually by principals of the corporation[,] if construed to be 'the corporation's guaranty of its own contract[,] [would be] redundant, illusory, absurd, and therefore unreasonable.'" *Standard Meat Co. v. Taco Kid of Springfield, Inc.*, 554 S.W.2d 592, 596 (Mo. Ct. App. 1977) (third alteration in original).

Therefore, the Guaranty is enforceable, and the Campbells are individually liable for liability incurred by Campbell Insurance.

### C.  Procurement of Breach of Contract

The plaintiff argues that summary judgment is appropriate on its procurement of breach of contract claim against the Campbells and A 2 Z. (Docket No. 403 at 16-21.) The plaintiff alleges that those defendants procured the breach of the 2005 Agreement by Campbell Insurance and Tommy Campbell. As stated earlier, the elements of a procurement claim are:

> (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff.

*Givens*, 75 S.W.3d at 405.

With regard to the claim that A 2 Z and Colleen Campbell procured Tommy Campbell's breach of the 2005 Agreement, many of these elements are not genuinely in dispute. The undisputed evidence shows that a legal contract existed between Tommy Campbell and

American National, of which Colleen Campbell and A 2 Z were undoubtedly aware.  Colleen

Campbell and A 2 Z, at a minimum, intended to induce Tommy Campbell to provide American

National customer information for A 2 Z's benefit; this conduct by Tommy Campbell constituted

a breach of his contractual obligation to "actively represent [American National]'s best

interests."  Colleen Campbell and A 2 Z acted with malice, because they intended to gain

business from Tommy Campbell's breach, and they knew that the breach would necessarily

injure the plaintiff.  *B&L Corp.*, 162 S.W.3d at 219; *AmeriGas*, 844 F. Supp. at 389.  Finally,

their actions were the proximate cause of Tommy Campbell's breach – without Colleen

Campbell and A 2 Z, he would not have divulged the plaintiff's customer information.

But factual issues exist regarding the extent of Tommy Campbell's breach of the 2005

Agreement, as well as the existence and measure of damages caused by his breach.  The

procurement claim based on Campbell Insurance's breach of the 2005 Agreement involves

similar factual issues regarding the extent of the breach and identical issues regarding damages.

Without damages, the plaintiff cannot show that the defendants' actions injured American

National, which is a necessary element of the procurement claims.  Accordingly, those claims

will remain for trial.

### D.        Intentional Interference with Business Relationships

The plaintiff also argues that summary judgment is appropriate on its intentional

interference with business relationships claim against the Campbell Defendants.  (Docket No.

403 at 21-23.)  American National alleges that the defendants interfered with its relationships

with its policyholders.  One necessary element of the claim, however, is "damages resulting from

the tortious interference." *Trau-Med*, 71 S.W.3d at 701 (footnotes and citation omitted).  As with the procurement claims against the Campbell Defendants, issues of fact regarding the existence of damages preclude summary judgment, and the claim will remain for trial.

**E.      Piercing the Corporate Veil**

Finally, the plaintiff argues that A 2 Z is a sham corporation and that the court should pierce the corporate veil separating it from the Campbells and Campbell Insurance.  (Docket No. 403 at 23-25.)

Under Tennessee law, to pierce the corporate veil, "a court must be convinced that the separate corporate entity is a sham or a dummy or that disregarding the separate corporate entity is necessary to accomplish justice."[41]  *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88-89 (Tenn. 2010) (quotation marks omitted).  When analyzing the issue, courts examine the following factors, although it is not necessary that all factors weigh in favor of piercing the corporate veil:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

---

[41] The plaintiff and the Campbell Defendants agree that Tennessee law applies to this issue.

*Id.* at 89 n.13 (quoting *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)).

The plaintiff is correct that some of these factors favor piercing the veil here; specifically, the plaintiff points to evidence that Campbell Insurance paid A 2 Z's bills and shared office space and employees and that A 2 Z was formed specifically to convert existing American National policyholders. But the Tennessee Supreme Court has stated that "[i]ssues relating to the piercing of the corporate veil are not ordinarily appropriate for resolution by summary judgment." *Id.* at 89. Instead, "a determination of whether or not a corporation is a mere instrumentality of an individual or a parent corporation is ordinarily a question of fact for the jury." *Id.* (quoting *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)).

Here, although the evidence certainly weighs in favor of the plaintiff, it is not so overwhelming that a reasonable juror must find that A 2 Z's corporate form should be disregarded. Accordingly, this issue will remain for trial.

## CONCLUSION

For all of the reasons discussed above, the plaintiff's two Motions for Summary Judgment will be denied. Montgomery's Motion for Summary Judgment will be granted in part and denied in part, and the plaintiff's TCPA claim against Montgomery will be dismissed. The Campbell Defendants' Motion for Summary Judgment will be granted in part and denied in part, and the plaintiff's breach of contract claim against Colleen Campbell will be dismissed. In addition, the defendants will be allowed to introduce evidence of offsetting benefits at trial. Finally, the plaintiff's Rule 56(d) Motion will be denied, as will Montgomery's request for

attorney's fees regarding the plaintiff's TCPA claim.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge