## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

AMERICAN NATIONAL PROPERTY   )
AND CASUALTY COMPANY         )
                             )
    **Plaintiff,**          )
                             )    **Case No.: 3:08-CV-00604**
**v.**                       )
                             )    **Judge Aleta A. Trauger**
CAMPBELL INSURANCE, INC.,    )    **Magistrate Judge John S. Bryant**
TOMMY L. CAMPBELL, and       )
MARSHA COLLEEN CAMPBELL,     )    **JURY DEMAND**
and A 2 Z INSURANCE, INC.    )
LIBERTY MUTUAL INS. CO., and )
MONTGOMERY MUTUAL INS.CO.    )
                             )
    **Defendants.**         )

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE
## TO EXCLUDE THE TESTIMONY OF TRACY COENEN

    The Defendants, Campbell Insurance, Inc., Tommy L. Campbell, Marsha Colleen Campbell and A 2 Z Insurance, Inc., (hereinafter "Campbell Defendants") submit this Memorandum in Support of their Motion in Limine to exclude the testimony of Plaintiff's accountant, Ms. Tracy Coenen. The Campbell Defendants rely upon the exhibits attached to their motion and the facts and authorities set forth herein.

### SUMMARY OF ARGUMENT

    ANPAC has retained an accountant, Ms. Tracy Coenen, to provide an estimate of lost profits with regard to policyholders terminating their coverages with ANPAC and obtaining coverage with other companies through A 2 Z Insurance, Inc. Ms. Coenen did so by preparing a spreadsheet listing each policy, calculating premiums lost in 2008 and an annual premium.[1] Ms. Coenen then multiplied the premium for 2008 by 8.1% representing her estimate of the profits lost for that year. She carried out the same calculation for 2009 with regard to the annual premium and again using 8.1 as the profit percentage. She repeated the procedure for years 2010

---

[1] Most of the policies terminated with ANPAC in 2008 so the 2008 figure is not an annual premium figure but a portion thereof, depending upon when the policy terminated.

through 2014, again using the profit percentage of 8.1. Beginning in the year 2010, Ms. Coenen applied an attrition rate of 11.4%, representing her estimate of the policies that would leave ANPAC in that year and, accordingly, should not be included in the lost profit calculation. She also applied a premium rate increase of 4.6% representing an estimated amount the premiums would increase for that policy. The profit percentage, attrition rate and premium rate increase are the same for each year.

The profit percentage chosen by Ms. Coenen is the arithmetic average of the companywide profits for ANPAC for the years 2005, 2006 and 2007. Ms. Coenen selected these years and maintains the average is a fair estimate of profits for the company. She has no support for this opinion.

The lost profit calculations cover a period of six and a half years. This damages period was selected by Ms. Coenen with input from individuals with ANPAC. Ms. Coenen does not support her choice of six and a half years and cannot do so.

The Campbell Defendants will show the profit percentage utilized by Ms. Coenen and the damages period are arbitrary and no proper foundation can be established for this testimony. The Campbell Defendants will show:

1.    ANPAC has testified, in the company's 30(b)(6) deposition in this case, the lost profit calculation is "based on assumptions that may or may not happen." That the 8.1% estimated profit, the 11.4% attrition rate and the 4.6% premium rate increases are "difficult of estimation."

2.    The 8.1% profit estimate does not represent the company's profits in 2008, 2009 or 2010. ANPAC experienced a companywide loss in 2008 of -9.58%. Another loss was experienced in 2009 of -1.3%. ANPAC eked out a profit for 2010 of 1.06%. Yet, in each of these years Ms. Coenen would testify ANPAC lost profits of 8.1% per year for the lost premiums.

3.  There is no support or indication the estimated lost profits of 8.1% is an accurate estimate for the remainder of the damage period selected by Ms. Coenen, 2011 through 2014.

4.  Ms. Coenen has employed a similar approach in a prior case, the *Brass* case. There, she testified ANPAC would sustain lost profits of 10% per year for the years 2005, 2006 and 2007, the very years she used in the present case to estimate a lost profit of 8.1%.

5.  The actual profit figure for ANPAC for the eleven years beginning in 2000 going through 2010 averages 2.68%. These are all of the financial reports that have been produced or made available in this case. The average of 2.68% is wildly different from 8.1% utilized by Ms. Coenen. Utilizing the actual profit percentage for the eleven-year period of 2.68% reduces Ms. Coenen's latest "grand total" for six and a half years from $393,222.00 to $130,101.00.

6.  Ms. Coenen has no support to offer for her selection of six and a half years. It is not based upon any statistical model, data or analysis. The only support she offers is her own feeling it would be a reasonable period.

7.  Ms. Coenen computes a grand total for her estimate of the lost profits through 2014 and then attributes a portion of that to Liberty Mutual and a portion of that to Safeco. Even though Safeco has settled out of this case, Ms. Coenen will not subtract the amount attributed to Safeco from the grand total. Nor will she concede that the amount of lost profit attributed to Liberty Mutual should be deducted from the grand total, which she contends is all attributable to the Campbell Defendants. Thus, her anticipated testimony would provide for a recovery of lost profits far in excess of the "grand total."

**STATEMENT OF FACTS**

**Coenen Analysis, Reports and Deposition Testimony**

     **1.**      **Reports and Methodology**

     Ms. Coenen has prepared six reports in this matter. Several of those reports deal with Tommy Campbell's pension benefits and are not the subject of the present motion. Three reports deal directly with her estimation of lost profits sustained by ANPAC and will be referenced, along with an updated "Policy Cancellations" spreadsheet, "Lost Profits" spreadsheet for years 2008 through 2014 and a "Present Value of Lost Profits" which have been only recently supplied.

     Ms. Coenen's first report is dated February 9, 2009 and is attached to Defendants' motion as Exhibit 1. Attached to the report is a "Policy Cancellations" spreadsheet and "Lost Profits" spreadsheet. The Policy Cancellations spreadsheet was not marked "Confidential – Attorneys' Eyes Only" when the initial report was served but has been subsequently. Accordingly, the Campbell Defendants will file the "Policy Cancellations" spreadsheet as Exhibit 1-A under seal, with the Court's permission.

     Ms. Coenen explains in her report the methodology she utilized. She was provided with a spreadsheet identifying customers of Campbell Insurance, Inc. whose policies were cancelled or went out of force in the months prior to termination of the agency agreement and the months following termination and who obtained coverage with other companies through A 2 Z Insurance, Inc. Where the customers had a particular code on the cancellation spreadsheet, they were analyzed by Ms. Coenen. She prepared her own spreadsheet with these policyholders detailing the policies and premiums. This is the "Policy Cancellations" spreadsheet attached to the Defendants' Motion as Exhibit 1-A.

     Ms. Coenen, in this initial report, calculated a total annual premium at issue of $854,384.00. For 2008, a partial year for many of the policies, the total premium was calculated

to be $492,134.00. Ms. Coenen indicates in the last paragraph on the first page of her report that she calculated a lost profit of 8.1% per year "based on the 2005 through 2007 profit percentages per ANPAC's financial statements." An attrition rate of 11.6% was used for years 2009 through 2014.[2] The attrition rate represents a percentage of policies that were cancelled each year and, thus, reduces the gross premium. She also applied a rate increase of 9% per year[3] based on information provided by ANPAC on rate increases in Tennessee. The rate increase percentage increases the premium amount to which the profit percentage is applied. Ms. Coenen indicates it is based upon information provided by ANPAC for rate increases in Tennessee.

Total lost profits are calculated by Ms. Coenen to be $405,237.00 in this initial report. Her calculations are set out on the "Lost Profits" spreadsheet. *Tracy Coenen Expert Report of February 9, 2009, Exhibit 1 and Exhibit 1-A; Deposition of Tracy Coenen taken May 4, 2010 page 87, line 4 through page 102, line 19, Exhibit 2; Deposition of Tracy Coenen taken April 12, 2011 page 289, line 12 through page 304, line 13, Exhibit 3.*

The next report prepared by Ms. Coenen and furnished to counsel is actually labeled "Supplement to Expert Report" and dated April 30, 2009. Ms. Coenen used the same basic methodology but made some changes to the report. Some policies were added to the "Policy Cancellations" spreadsheet. She changed the persistency rate somewhat from 11.6% to 11.4%. She reduced the premium rate increase percentage significantly from 9% per year to 4.6% per year. She continued utilization of the 8.1% profit. Her total "lost profits" is indicated on this report to be $380,107.00. *Coenen Report of April 30, 2009, Exhibit 4 and 4-A under seal.*

The final report prepared by Ms. Coenen dealing with lost profits is also labeled "Supplement to Expert Report," and is dated April 13, 2010. Additional policies were added to the "Policy Cancellations" spreadsheet. The attrition rate remained 11.4%. The premium rate increases rate remained at 4.6%. The profit percentage utilized was 8.1% per year. The "Lost

---

[2] The attrition rate percentage is changed in later reports.
[3] The rate increase percentage is changed in subsequent reports.

Profits" spreadsheet was altered to indicate lost profits attributable to policies replaced with Liberty Mutual policies and policies replaced with Safeco policies. The columns for Liberty Mutual and for Safeco are subsets of the "Grand Total" column and not figures in addition thereto. *Coenen Report of April 13, 2010, Exhibit 5 and 5-A under seal; Deposition of Tracy Coenen taken April 12, 2011 page 342, line 9 through page 343, line 14, Exhibit 3.*

Plaintiff recently provided several "Supplemental Rule 26(A)(1) Disclosures." The most recent was served on July 25, 2011. Attached to these "supplemental" disclosures were revised "Policy Cancellations" spreadsheets, revised "Lost Profits" spreadsheets and a "Present Value of Lost Profits" spreadsheet. Presumably, these revised spreadsheets will be utilized by Ms. Coenen in her presentation. Copies of the "Lost Profits" spreadsheet and "Present Value of Lost Profits" spreadsheet are attached to Defendants' Motion as Exhibit 6. A copy of the revised "Policy Cancellations" spreadsheet will be filed as an exhibit to Defendants' Motion as Exhibit 6-A under seal, with the Court's permission.

Safeco has been removed from the "Lost Profits" spreadsheet. Of course, Safeco reached a settlement with the Plaintiff sometime back. However, the amount attributed to Safeco was not deducted from the "Grand Total." *Revised "Lost Profits" spreadsheet, Exhibit 6.*

## 2. Testimony

Ms. Coenen testified concerning the profit percentage she utilized during her deposition taken on May 4, 2010. She explained she utilized the financial statements of ANPAC. She looked at financial statements for 2005, 2006 and 2007. She computed the profit percentage for the company for each year and then averaged the three numbers to arrive at 8.1%. *Deposition of Tracy Coenen taken May 4, 2010, page 92, line 6 through page 93, line 10, Exhibit 2.*

The percentage of profit for each year was calculated from the "Statement of Income" sheet contained in each financial statement. Ms. Coenen divided the "net income" by the

"premiums earned" to arrive at the percentage of profit. *Deposition of Tracy Coenen taken May 4, 2010, page 257, lines 4-22, Exhibit 2.*

Ms. Coenen did not review ANPAC's financial statements for 2008 and 2009. However, she indicated she would like to see those financial statements and "could factor them into my calculations." *Deposition of Tracy Coenen taken May 4, 2010, page 114, line 24 through page 115, line 4, Exhibit 2.* Plaintiff's expert acknowledged the percentage profit utilized in her analysis was important. She agreed utilizing a profit percentage of 4.05 instead of 8.1 would reduce by half the total amount of lost profits she had calculated. She agreed the appropriate percentage was important. When asked if she did not check the later years, she replied "I did not have the financial statements for the later years." She further indicated she did not attempt to get them online. Finally, she did not ask ANPAC to furnish them. *Deposition of Tracy Coenen taken May 4, 2010, page 115, line 12 through page 116, line 21, Exhibit 2.*

Ms. Coenen was questioned about the importance of the profit percentage further. She testified on May 4, 2010:

> Q.    Now, this report is dated April the 13th, 2010, correct?
>
> A.    Yes.
>
> Q.    It's almost a year later than your last report, right?
>
> A.    Yes.
>
> Q.    Okay. And you are still using an 8.1 percent per year profit percentage based upon the financial statements of ANPAC for the years 2005, 2006, and 2007; is that right?
>
> A.    Yes.
>
> Q.    So again, here on April the 13th, 2010, you still have not checked the profit percentages for '08 and '09, have you.
>
> A.    Correct.
>
> Q.    And you didn't ask for those from ANPAC, did you.
>
> A.    Correct.

Q.     The lost profit figure you come up with this time, and we'll discuss why in a few moments, but that total is $395,069; is that right?

A.     Yes.

Q.     Again, if the profit percentage is not 8.1 percent but half that then that figure would be half that, wouldn't it.

A.     Yes.

Q.     It would be something less than 200,000 if you reduce the profit figure by half, right?

A.     Yes.

Q.     And you don't know sitting here today if that would be a more accurate estimate or not, do you, based upon '08 and '09 profits.

A.     No.

*Deposition of Tracy Coenen taken May 4, 2010, page 117, line 7 through page 118, line 14, Exhibit 2.* Ms. Coenen had had an opportunity to become familiar with ANPAC's profit, or lack thereof, for 2008 and 2009 by the time her deposition was resumed on April 12, 2011. In fact, she testified that she had reviewed the company's profit figures from the year 2000 through 2010. Unfortunately, she could not recall what the profit percentage was for 2010. She did not know what profit percentage she arrived at when she calculated the average profit from 2000 through 2009 and the only support she could give for her insistence that 8.1% was a fair and reasonable profit estimate for ANPAC for 2008 through 2014 was that she had looked at the profit figures going back to 2000 and so was convinced her number was reasonable. *Deposition of Tracy Coenen taken April 12, 2011, page 310, line 3 through page 314, line 25, Exhibit 3.*

While Ms. Coenen could not recall the profit percentage of ANPAC for 2010, the financial statement is available. The 2010 "Statement of Income" for ANPAC indicates "Premiums Earned" of $557,011,546.00 and "Net Income" of $5,927,162.00 for a profit percentage of 1.06%. *ANPAC Financial Statements - Statement of Income – 2000 through 2010,*

*Exhibit 7.* The ANPAC "Statement of Income" for 2008, using the same calculation, shows a profit of -9.58%. The "Statement of Income" for ANPAC for 2009 shows a profit of -1.30%. *ANPAC Financial Statements - Statement of Income – 2000 through 2010, Exhibit 7.*

Ms. Coenen acknowledged the numbers for 2008 and 2009 in her deposition of April 12, 2011. She acknowledged the company did not have an 8.1% profit for 2008 but, instead, a loss of 9.58%. She acknowledged the company did not have a profit of 8.1% in 2009 but, instead, had a loss of 1.3%. *Deposition of Tracy Coenen taken April 12, 2011, page 326, lines 3-19, Exhibit 3.*

Ms. Coenen has been retained by ANPAC in other cases. She has been retained by ANPAC in six to eight cases to assist as an expert witness. One of the first cases in which she was retained involved former agent, Tom Brass. She was retained in 2004 or 2005 to testify in that case. *Coenen Report of February 9, 2009, Exhibit 1; Deposition of Tracy Coenen taken May 4, 2010, page 37, line 13 through page 38, line 23, Exhibit 2.*

The *Brass* case was very similar to the present case. It involved similar calculations and parameters. Tom Brass had been sued by ANPAC for a dollar amount of lost profits, just like in the present case. In the case of Mr. Brass, Ms. Coenen used a 10% profit percentage and projected the losses out over six years. Her report in the *Brass* case was dated December 3, 2004 and so the damage period included the years 2005 through 2007. Those are the same years for which Ms. Coenen has calculated the actual profit of ANPAC to be 8.1%. She acknowledged the 2% actual profit percentage difference would have meant a difference of $50,000 or $60,000 to Mr. Brass. *Deposition of Tracy Coenen taken May 4, 2010, page 103, line 3 through page 109, line 18, Exhibit 2.*

Ms. Coenen selected six and a half years for the damages period after talking with ANPAC personnel, determining damages could extend for ten years or more, and coming up with a "conservative" estimate of how long damages would continue. She based her opinion on

her own experience in calculating damages and estimating damage periods. She did not use any statistics, figures, numbers or anything like that and perform calculations on them.

> A.   I did that after talking with ANPAC personnel and determining that it's likely that damages could extend ten years, probably even more than ten years. And considering that, I tried to come up with a conservative estimate of how long damages would continue.
>
> Q.   Okay. Anything else? Anything else you based that on?
>
> A.   I based it on my experience in calculating damages and estimating damage periods.
>
> Q.   Okay. Ms. Coenen, did you do any calculations to arrive at that six-and-a-half years?
>
> A.   No.
>
> Q.   All right. Didn't use any statistics, figures, numbers, or anything like that and perform calculations on them, and say, so six-and-a-half years is appropriate. That did not happen?
>
> A.   It was not a statistical analysis.

*Deposition of Tracy Coenen taken April 12, 2011, page 370, line 17 through page 371, line 20 – quoted passage from page 371, lines 3-20, Exhibit 3.*

While Ms. Coenen indicated she had looked at some literature concerning the damage period, she could not cite any literature supporting that position and had not produced any. She acknowledged she had been asked to produce any treatises or literature supporting her position in her deposition taken on May 4, 2010. She further acknowledged that she had not done so. *Deposition of Tracy Coenen taken April 12, 2011, page 371, line 21 through page 374, line 11, Exhibit 3.*

## ANPAC Rule 30(b)(6) Testimony

ANPAC agrees it is not possible to estimate damages in the future as Tracy Coenen has done.

> Q.   Okay. Well, here's my question, Mr. Leeper, and so you know where we're going. I'm going to explore this some

time here. But we spent a great deal of time and ANPAC spent a great deal of time working with your expert Tracy Coenen or Coenen. I've forgotten how to pronounce her name. Tracy Coenen?

A.     I think it's Coenen.

Q.     Coenen. Working with her to – to prepare calculations about ANPAC's damages in this case. And you and I went over that at length during your prior deposition. Do you remember that?

A.     Yes.

Q.     And you worked with Tracy Coenen yourself some, right?

A.     Yes.

Q.     Not only in this case but at least in one prior case, the Tom Brass case, correct?

A.     Yes.

Q.     And she calculated ANPAC's damages, didn't she?

A.     She calculated some damages, yes.

Q.     And she arrived at a figure representing the loss of profits to ANPAC, which -- which has been the basis of your claim up until these amended answers, correct?

MR. URNESS: Object to the form.

THE WITNESS: She did.

*Deposition of American National Property & Casualty Company taken December 15, 2010, page 22, line 9 through page 23, line 15, Exhibit 8.*

Q.     Okay. So ANPAC can calculate damages caused by the harm of breach of this agreement and do so accurately; is that right?

MR. URNESS: Objection.

THE WITNESS: I don't know if you can do it accurately because you are projecting into the future. And I don't think anyone knows what the loss in the future will be. So I don't see how you can project that accurately.

*Page 23, lines 13-23, Exhibit 8.*

Q. Look at that last page with me. I think it says at the top, Mr. Leeper, "lost profits"?

A. Yes.

Q. And this is Exhibit B to Ms. Coenen's report; is that right?

A. Yes.

Q. And there she calculates the lost profits to ANPAC resulting from the claimed breach of contract of my clients; is that right?

A. She did.

Q. She calculated the lost profits as a result of the alleged wrongs or tortuous conduct of Liberty Mutual and Safeco; is that right?

A. Yes.

Q. And she did that for the year 2008; is that correct?

A. Yes.

Q. And then she did it for 2009?

A. Yes.

Q. And '10?

A. Yes.

Q. And '11?

A. Yes.

Q. And '12?

A. Yes.

Q. And '13?

A. Yes.

Q. And '14?

A. Yes.

Q.    So she did carry out those damages for a period of years after the termination of Tommy Campbell and Campbell Insurance, Inc., didn't she?

A.    She did.

Q.    And that's what you indicated would be difficult to accurately estimate just a few moments ago; is that right?

A.    Yes.

Q.    And you agree with that statement now that it would be difficult to arrive at a figure for those years after 2008; is that right?

MR. URNESS:  Asked and answered a third time.

THE WITNESS:  Yes.

*Page 32, line 2 through page 33, line 24, Exhibit 8.*

Q.    Now, when you say "as a company," you know that Ms. Coenen took this 8.1 percent or arrived at that as an estimate of profits for the company, correct?

A.    I'm not sure how she came up with 8.1 percent.

Q.    Well, look at the first page.  Down toward the bottom there's some bullet points.  Look at the last one.

A.    Okay.

Q.    "Profit is 8.1 percent per year, based on the 2005 through 2007 profit percentages per ANPAC's financial statements."

A.    Okay.

Q.    So now do you know where she got the number?

A.    Yes.

Q.    Okay.  Go back to the lost profit section.  For 2008 the profit percentage per ANPAC's financial statements would be a net loss, wouldn't it?  Instead of 8.1 percent, it's going to be a negative number.

MR. URNESS:  Objection, counsel.  If I'm not mistaken, you asked these very same questions in May --

BY MR. KEYT:

Q.    It's going to be a negative number?

A.    On a company basis, yes.

Q.    Which is what she used?

A.    Yes.

Q.    Is that one of the things that is difficult of estimation that you were referring to?

MR. URNESS:  Asked and answered.

THE WITNESS:  Yes.

BY MR. KEYT:

Q.    And then she used that same profit percentage for 2009?

A.    Yes.

Q.    And, in fact, in 2009 there was a loss for that year as well?

A.    Yes.

Q.    We don't know what the profit -- profit percentage is going to be for 2010, right?

A.    Right.

Q.    Obviously we don't know what the profit percentage is going to be for '11, '12, '13, '14, right?

A.    Right.

Q.    But she's used 8.1 percent for each of those years, correct?

A.    Yes.

Q.    That's the kind of thing you're talking about when you say it's difficult of estimation?

A.    Yes.

Q.    She used some other numbers here.  There's an attrition rate that's applied beginning in 2009 -- I'm sorry, 2010?

A.    Yes.

| Q. | And she used 11.4 percent? |
|---|---|
| A. | Yes. |
| Q. | Is that another thing that's difficult of estimation? |
| A. | Difficult to estimate accurately. |
| Q. | Okay. And the rate increases, you see she used 4.6 percent for that? |
| A. | Yes. |
| Q. | Is that another thing that's difficult of estimation? |
| A. | Accurately, yes. |
| Q. | So those are the things that you were considering when you mentioned that it's difficult to do an accurate estimation for these lost profit damages? |
| A. | Yes. |

*Page 44, line 4 through page 47, line 6, Exhibit 8.*

The critical components of Tracy Coenen's analysis – profit percentage, attrition rate and premium increases – are speculative according to testimony of ANPAC. ANPAC acknowledges these matters cannot be predicted from year to year with reasonable certainty. Accordingly, the opinions of Tracy Coenen are speculative.

**ANPAC Financial Statements**

Financial statements for ANPAC are available for years 2000 through 2010. *ANPAC Financial Statements - Statement of Income – 2000 through 2010, Exhibit 7.* The "Statement of Income" indicates the following profit percentages for ANPAC, calculated pursuant to the method outlined by Tracy Coenen. *Deposition of Tracy Coenen taken May 4, 2010, page 256, line 1 through page 257, line 9, Exhibit 2.*

| | |
|---|---|
| 2000 | -1.76% |
| 2001 | -0.91% |

| | |
|---|---|
| 2002 | 1.33% |
| 2003 | 5.79% |
| 2004 | 10.32% |
| 2005 | 9.07% |
| 2006 | 4.41% |
| 2007 | 11.05% |
| 2008 | -9.58% |
| 2009 | -1.30% |
| 2010 | 1.06% |

29.48 / 11 =   2.68%

The average profit percent for ANPAC for the last eleven years is 2.68%.

## LAW AND ARGUMENT

The admissibility of expert testimony, including purported accounting expert testimony, is controlled by Rule 702 of the Federal Rules of Evidence. The Rule provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In construing these requirements, the United States Supreme Court has held that in order to qualify as "scientific, technical or specialized knowledge," "an inference or assertion must be derived by the scientific method and proposed testimony must be supported by appropriate validation, i.e., 'good grounds' based on what is known." *U.S. v. Pollard*, 128 F.Supp.2d 1104, 1107-1108 (E.D. Tenn. 2001) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)). In other words, "the word 'knowledge' connotes more than

subjective belief or unsupported speculation." *Id.* at 1107 (citing *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1352 (6th Cir.1992)).

While there is no "definitive checklist or test" for determining whether expert testimony is reliable and thus admissible, the *Daubert* Court "set forth a number of factors that typically 'bear on the inquiry.' " *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 176 (6th Cir. 2009) (citing *Daubert*, 509 U.S. at 593). These reliability-related factors include "whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, whether it has a known or potential rate of error, and finally, whether the theory or technique enjoys general acceptance in the relevant scientific community." *Id.* at 594, 113 S.Ct. 2786. In a footnote, the Court in Daubert emphasized that "evidentiary reliability [means] trustworthiness." Id. at 590, n. 9.

The Rule 702 inquiry is "a flexible one," and "[t]he focus ... must be solely on principles and methodology, not on the conclusions they generate." *Best,* 563 F.3d at 176. In short, "[a]n expert who presents testimony must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 176 (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)). The Sixth Circuit has observed that "[t]he party seeking to have the testimony admitted bears the burden of showing 'that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.' " *Id.* at 1108(quoting *Smelser v. Norfolk Southern Railway Co.,* 105 F.3d 299, 303 (6th Cir.) *cert. denied,* 522 U.S. 817, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997)). Furthermore, in the Sixth Circuit, "[t]he failure of [a party's] experts to test their hypotheses in a timely and reliable manner or to validate their hypotheses by reference to generally accepted scientific principles as applied to the facts of [the] case renders their testimony ... unreliable and therefore inadmissible...." *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir. 2000).

Under Fed. R. Evid. 702 and the guideposts established in *Daubert*, "conclusions based only on personal opinion and experience do not suffice to establish the reliability or utility of expert testimony." *Brown v. Raymond Corp.,* 432 F.3d 640, 648 (6th Cir. 2005). "Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury." *McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266, 1273 (6th Cir.1987).

While a person may be qualified as an expert, his or her testimony may still be inadmissible if the methodology "employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis" is unreliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). Simply put, "[p]roposed [expert] testimony must be supported by appropriate validation." *Daubert*, 509 U.S. at 590. If there is not sufficient validation, the testimony should be deemed inadmissible.

**Damage Period**

The opinion advanced by Ms. Coenen that lost profits should be calculated for a six and a half year period should be supported by something other than her own, unsupported, judgment as to what would be fair. Ms. Coenen, repeatedly, articulates two rationales for selection of six and a half years for the lost profit calculations. She indicates it is based on her experience and discussions with personnel at ANPAC. *Deposition of Tracy Coenen taken May 4, 2010, page 151, line 9 through page 153, line 20, Exhibit 2.* No other basis for her opinion is offered. Respectfully, the period of time for which she calculates the lost profits is arbitrary. It is a subjective judgment unsupported by others in her field.

The Sixth Circuit has held that the "reliability determination must be based on a deeper analysis of a witness's use of particular methodology, in order to determine whether the witness's testimony is sufficiently reliable to allow the trier of fact to deem their testimony 'expert' in this case." *Coffey v. Dowley Mfg., Inc.*, 187 F.Supp.2d 958, 975 (M.D. Tenn. 2002). Without a valid

methodology for estimating the damage period, Ms. Coenen can only provide unsupported conclusions concerning why ANPAC's damages would extend beyond the non-competition period of one year.

The fundamental problem with Ms. Coenen's opinion concerning the damage period is that she is unable to support it with any reliable statistics, published articles, peer-reviewed literature, or historical data. Ms. Coenen's methodology cannot be tested, as she agrees that she did not perform any type of statistical analysis. In fact, she performed no calculations whatsoever to estimate the damage period. Furthermore, based on the same methodology that Ms. Coenen has employed in prior ANPAC cases, there is a real possibility of error in her calculations.

Ms. Coenen has been unable to support her methodology for estimating the damage period with any objective data, studies or published opinions from other forensic accountants concerning the subject of estimating damage periods. The Campbell Defendants have repeatedly asked for peer review articles or publications which might support Ms. Coenen's methodology. Although Ms. Coenen, in both depositions, indicated there were articles or treatises that would support her selection of six and a half years, none have been produced despite being requested.

In her initial report of February 9, 2009, Ms. Coenen provides no support for her extrapolation of damages for six and one-half years. She merely states, "[t]he total lost profits to ANPAC for 2008 through 2014 equal $405,237." *Tracy Coenen Expert Report of February 9, 2010*. Quite obviously, this arbitrary extrapolation was a point of inquiry during Ms. Coenen's discovery deposition on May 4, 2010. Ms. Coenen was asked point blank why she extrapolated ANPAC's losses for six and one-half years. Ms. Coenen testified as follows:

> Q: Okay. And so the period of time that you have selected is rather arbitrary, you agree with that?
>
> A: I will not agree with that.

Q:      Could have been four years.

A:      I suppose it could have been any number of years.  It could have been a hundred years, sure.

Q:      Well, then why – you just picked a number of years.   Do you have some – is there some data that you have used to support that?   Do you have some articles? Do you have some peer-reviewed literature that supports going out six years?

A:      The period of loss is selected based on my experience in calculating damages in cases where we typically might calculate damages out for three, five, seven, ten years.  Those are fairly common numbers of years that we see if there is no better guidance that specifies a specific period of damage, so in this case, initially in the first case that I worked on with ANPAC I know that I had the discussion with either Pat Leeper or Stuart Paulson or both about those various periods of loss and how long they really felt that their losses could continue from a customer being improperly taken from them in one year, and realistically it could go out for well beyond ten years.   When I came to the decision seven years and just due to losses starting in the middle of one year we just rounded down to 6.5 years, and that is a very conservative estimate of the years of loss knowing that losses could continue for several years beyond that.

                                    …

Q:      And it's just your judgment and the folks at ANPAC that you base that on.

A:      It is based on the knowledge of ANPAC personnel as well as my knowledge and experience in calculating damages.

Q:      Okay.  Now, can you cite me to any published authorities that would support your decision in that regard?   Do you have any articles on that, anything you relied on that?

A:      If you'd like me to research that and find some articles I'd be happy to do so.

Q:      Okay.  But you don't have any, haven't cited any, and don't know of any as you sit her, right?

A:      I know that there are articles that exist that discuss the period of loss for damages.

Q:      Okay.

A:      I know that I have books at my office that have articles in them that discuss the period of loss.

Q:      All right.

A:      We'd be happy to produce them.

Q: And I'll get back to that, Ms. Coenen. And you're going to follow a supplemental report, aren't you?

A: I do believe that I am going to file a supplement report.

Q: Then you – I assume when you do that you could list these articles or text or whatever you're talking about, right?

A: If someone directs me to do so, yes.

Q: Okay. Well, I would appreciate it, if you think you have support for that six and a half year period, if you would do that when you prepare your supplemental report. Okay. I would like to see that.

*Deposition of Tracy Coenen taken May 4, 2010 page 149, line 10 through page 150, line 20 and page 154, line 9 through page 155, line 19, Exhibit 2.*

It could not have been any clearer that counsel for the Campbell Defendants wished to review the articles upon which Ms. Coenen based her methodology. Yet, in her supplemental report of March 18, 2011, she provided no citation to any authority – not even to the books she claims she had in her office – which would support her methodology. Again, on April 12, 2011, counsel for the Campbell Defendants questioned Ms. Coenen about the support for her methodology. Ms. Coenen testified as follows:

Q: All right. Now, during your discovery deposition back in May of last year, we discussed this, and you said that there was support in the literature for this. And you were going to get it and provide it. And I haven't seen anything. Now, have you done that?

A: Yes, there's literature discussing damage periods and how to - - you know, the facts that must be considered in determining what an appropriate damage period is. So, yes, there is literature and it exists.

Q. Right. Have you pulled it and provided it.

A: I have looked at it. I did not - - one source in particular that I looked at I did not provide because I ended up not basing my opinion on it.

…

Q: All right. Has ANPAC or ANPAC's attorney directed you to produce these articles?

A: No.

*Deposition of Tracy Coenen taken April 12, 2011 page 371, line 21 through page 372, line 11 and page 374, lines 9-11, Exhibit 3.*

It is clear that Ms. Coenen's guesstimate of six and one-half years of damages is unsupported by any industry research. Rather, she relies only on her "experience" and the statements of ANPAC's vice-president, who has not been shown to have any background in forensic accounting, and ANPAC's lawyer. As the Sixth has found, "conclusions based only on personal opinion and experience do not suffice to establish the reliability or utility of expert testimony." *Brown v. Raymond Corp.,* 432 F.3d 640, 648 (6th Cir. 2005).

Ms. Coenen has provided no evidence that demonstrates that her methodology, or the way she applied her methodology in this case, falls within the range of accepted accounting principles, or that anyone in the accounting field could test the validity of it. In the Sixth Circuit, "[t]he failure of [a party's] experts to test their hypotheses in a timely and reliable manner or to validate their hypotheses by reference to generally accepted scientific principles as applied to the facts of [the] case renders their testimony ... unreliable and therefore inadmissible...." *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir. 2000).

More importantly, ANPAC even acknowledges extrapolation of anticipated "lost profits" into the future is speculative. ANPAC, the proponent of Ms. Coenen's opinions, acknowledges the profit percentage, attrition rate and premium increase rate cannot be known for future years, making any estimate of lost profits difficult. As ANPAC testified during the 30(b)(6) deposition of December 15, 2010:

> I don't know if you can do it accurately because you are projecting into the future. And I don't think anyone knows what the loss in the future will be. So I don't see how you can project that accurately.

*Deposition of American National Property & Casualty Company taken December 15, 2010, page 23, lines 13-23, Exhibit 8.* Obviously, this difficulty projecting these key components of Ms.

Coenen's analysis into the future renders suspect the entire analysis over the six and a half year period.

**Lost Profit Percentage**

The profit percentage of 8.1 selected by Ms. Coenen is also speculative and cannot survive *Daubert* scrutiny. That has now been proven in that we have the actual profit percentages for 2008, 2009 and 2010.

ANPAC acknowledges it is not possible to predict the company's profit into the future. ANPAC acknowledges the company did not earn a profit of 8.1% for 2008 and 2009. As of the date of the deposition, December 15, 2010, ANPAC acknowledged the actual profit percentage for 2010 through 2014 was unknown and would be "difficult of estimation."

Ms. Coenen was questioned concerning the basis of her opinion that 8.1% would be an accurate estimation for profits earned by the company for the years 2008 through 2014. She indicated the arithmetic average for profits for 2005 through 2007 would be a reasonable estimate but she cannot support that opinion. She can doggedly cling to the opinion, but she fails to come forward with any support.

The financial statements of ANPAC considered by Ms. Coenen in preparing for her second deposition do not support her opinion. Interestingly, she indicated that she had reviewed the ANPAC financial statements for the years 2000 through 2010 but could not, conveniently, recall what she had calculated. All she would say is the statements support her opinion. In actuality, the ANPAC financial statements show an average profit for the years 2000 through 2010, an eleven-year period, of 2.68%. This is radically different from her own opinion of 8.1%. If the actual profit percentage for the last eleven years were utilized, Ms. Coenen's "grand total" of lost profits would be reduced from $393,222.00 to $130,101.00. She testified in her deposition that she reviewed these very figures and that they support her use of the 8.1% profit figure. Obviously, they lend no support to the use of that figure.

Ms. Coenen's "grand total" of lost profits contains two subsets. A portion of the "grand total" is attributed to Liberty Mutual and represents lost profits as a result of policies placed with Liberty Mutual. A similar figure was calculated for Safeco. However, once Safeco reached a settlement, Ms. Coenen still uses the same "grand total" of lost profits. No deduction was made for those lost profits which, presumably, have now been paid to ANPAC. Similarly, she will not concede that that amount attributable to Liberty Mutual should be deducted from the "grand total" which she attributes to the Campbell Defendants.

Ms. Coenen cannot support her opinion that 8.1% is an appropriate profit percentage. The actual figures belie her estimate. ANPAC agrees the company actually had losses for 2008 and 2009 and any attempt to estimate profits in the future is speculative.

## CONCLUSION

The analysis prepared by Ms. Coenen is "junk science." Her opinion concerning the damage period is unsupported. It is simply her own judgment, untested by the scientific community and unvalidated in any way. Her opinion concerning the profit which will be earned by ANPAC for the years 2008 through 2014 is belied by the actual earnings for 2008 through 2010 and is unsupported by earnings for the years 2000 through 2010.

ANPAC agrees the three components of Ms. Coenen's analysis, profit percentage, attrition rate and premium increase rate, cannot be estimated with any accuracy into the future. Accordingly, ANPAC agrees Ms. Coenen's analysis is speculative.

The Campbell Defendants respectfully move the Court for an Order prohibiting Ms. Coenen from testifying concerning her lost profit analysis and prohibiting any party or witness from discussing the analysis.

Respectfully submitted,

LEITNER, WILLIAMS, DOOLEY
& NAPOLITAN, PLLC

By:    s/Steven W. Keyt
        STEVEN W. KEYT (009200)
        *Attorneys for Defendants, Campbell*
        *Insurance, Inc., Tommy L. Campbell,*
        *Marsha Colleen Campbell and A2Z Insurance, Inc.*
        801 Broad Street, Third Floor
        Chattanooga, TN 37402
        Phone: (423) 265-0214
        Fax: (423) 267-6625

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

| | |
|---|---|
| Thor Y. Urness, Esq. | John R. Wingo, Esq. |
| Jonathan D. Rose, Esq. | Brian C. Neal, Esq. |
| Bradley, Arant, Boult, Cummings LLP | Stites & Harbison, PLLC |
| P.O. Box 340025 | 401 Commerce Street, Suite 800 |
| Nashville, TN 37203-0025 | Nashville, TN 37219 |

This   13th   day of    September   , 2011.


By:    s/Steven W. Keyt